IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

APRIL PLOEGER,

               Plaintiff,

    v.

                                  CIVIL ACTION
                                  NO. 22-02389

TRUSTEES OF THE UNIVERSITY
OF PENNSYLVANIA,

               Defendants.

## OPINION

**Slomsky, J.**                                        **January 31, 2023**

### I.    INTRODUCTION

April Ploeger is a student enrolled at the University of Pennsylvania (the "University"). She requested and the University granted as an accommodation to her leaves of absence for medical reasons between 2006 and 2015.[1]  In 2009, Ploeger first met Dr. William Alexander, the Interim Director of the University's Counseling and Psychology Services ("CAPS") Department and received mental health counseling.  She alleges that during her counseling sessions, Dr. Alexander made inappropriate sexual advances toward her, causing her to attempt to commit suicide in 2009.  In 2015, Ploeger attempted suicide again by overdosing on medications prescribed by Dr. Alexander.  Despite this attempt, he wrote another prescription for her.

---

[1]  Ploeger informed the University's Office of Student Disability Services ("SDS") that she had an auto-immune disease, depression, and anxiety.  (Doc. No. 2-1 at 5-6.)  As a result, she was granted leaves of absence for the 2006 to 2007 academic year and the 2007 to 2008 academic year.  (Id. at 6-7.)  The University also granted her a test-taking accommodation for the Spring 2009 semester.  (Id. at 6.)  Ploeger took another extended leave of absence from the Spring 2009 semester because Dr. Alexander "continuously pursued a sexual relationship with" her.  (Id. at 7.)  She remained on leave up to the Spring 2015 semester.  (Id.)

After Ploeger reported Dr. Alexander's misconduct to the University in 2015, the University denied Ploeger her previously-granted test-taking accommodation. She then retained legal counsel to have the University grant her requests. Rather than grant the requests, the University required Ploeger to meet with CAPS personnel again. Still terrified from her interactions with Dr. Alexander, she would not do so unless she was permitted to bring a witness with her to the meeting. The University refused her request and she dropped Spring 2016 semester. She then sought re-enrollment for the Spring 2018 semester but the University required that she pay a several hundred-dollar fee first. Later on, Ploeger's counsel filed a breach of contract lawsuit against Defendants in state court. Thereafter, the University conditioned Ploeger's enrollment on the payment of several thousands of dollars.[2]

Before the Court is Ploeger's Fourth Amended Complaint against Defendants Trustees of the University. She alleges the following claims: (1) breach of contract for failing to provide her with free, high-quality healthcare, relying on Dr. Alexander's misconduct; (2) violations of the Americans with Disabilities Act ("ADA") by failing to accommodate her reasonable requests or to engage in the ADA-required interactive process[3]; (3) retaliation under the ADA and Title IX[4] by raising her re-enrollment fees after she filed her initial lawsuit; and (4) negligent supervision by failing to control Dr. Alexander's conduct and failing to terminate him after she reported his misconduct.

---

[2]  The Fourth Amended Complaint refers to fees ranging from "several hundred[s]" to "several thousand[s]" of dollars, but does not give an exact amount. (Id. at 10-11.)

[3]  During the hearing on the Partial Motion to Dismiss, Plaintiff's counsel consented to dismissal of these claims without prejudice. Thus, Counts III and IV will be dismissed without prejudice.

[4]  Title IX refers to Title IX of the Education Amendments of 1972.

Before the Court is Defendants' Partial Motion to Dismiss the Fourth Amended Complaint.[5] (Doc. No. 2.) For reasons stated below, the Partial Motion to Dismiss will be granted in part and denied in part.

## II.   BACKGROUND

### A.   Factual Background[6]

Plaintiff was admitted to the University as an undergraduate in 2006. At some point, she was diagnosed with having an auto-immune disease, depression, and anxiety. (See Doc. No. 2-1 at 5.) For the 2006 to 2007 and 2007 to 2008 academic years, Plaintiff requested, and the University granted, accommodation requests "in the form of a leave of absence for her conditions . . . ." (Id. at 6.) Plaintiff also sought accommodation to modify her test-taking during the Spring semester of 2009. (See id.) She made similar accommodation requests up to the Spring 2015 semester, each of which were granted by the University. (Id. at 7.)

In 2009, after seeking counseling from Dr. William Alexander, the Interim Director of the University's CAPS Department, he made inappropriate sexual advances toward and, on at least one occasion, touched Ploeger without her consent "in the context of his previously stated sexual interest in her." (Id. at 6.) Following these attempts, Plaintiff attempted suicide and Alexander apparently told her to "go home and put a band-aid on it." (Id. at 7.)

In 2015, Plaintiff made another suicide attempt by overdosing on prescription pills prescribed by Dr. Alexander. (See id.) Alexander wrote her another prescription but did not refer

---

[5]   Defendants title the Motion as a "Partial Motion to Dismiss" because it seeks dismissal only of Counts I, VI, VII, and VII and "all time-barred averments." (Doc. No. 2 at 5-6.)

[6]   The following facts are taken from the Fourth Amended Complaint and are accepted as true for the purposes of the Partial Motion to Dismiss. The Court also notes that most of the dates in the Fourth Amended Complaint refer only to years and semesters rather than to more specific dates.

Plaintiff for additional mental health treatment.  (See id.)  "In or around 2015," Plaintiff reported Dr. Alexander's conduct to the University.  (Id.)  Dr. Alexander allegedly threatened her in response.  (See id.)  Plaintiff next reported Dr. Alexander's conduct to his supervisor and to the University's President.  (See id. at 8.)  "Almost immediately" after contacting Alexander's supervisor and the University President, Plaintiff "was informed by [the University] that she would be arrested if she continued to make reports about [Dr. Alexander]."  (Id.)  Additionally, Plaintiff met with Hikaru Kozuma, who presumably is an administrator at the University, and "another unidentified female."  (Id.)  At the same time as this meeting, "during which [Plaintiff] was threatened for complaining about [Dr. Alexander]," University Police allegedly entered Plaintiff's off-campus apartment, "ransacked" it, and apparently retrieved "the prescription for pills that [Dr. Alexander] sent her away with a[s] [sic] discussed supra, and an itemized list of grievances against PENN."  (Id.)

Before the start of the Spring 2016 semester, Plaintiff decided to return to the University and made the same accommodation request which the University had granted her every time she had requested an accommodation since the Spring 2009 semester.  (See id.)  From the Complaint, this request could only be for modifications in her test-taking.  Before granting this accommodation, the University required Plaintiff to meet with CAPS personnel.  (See id. at 9.)  Plaintiff requested the presence of a witness or an advocate at the meeting.  (See id.)  However, the University denied this request.  (See id.)  Accordingly, because Plaintiff was terrified to meet with CAPS personnel again and could not bring an advocate or a witness with her, she refused to go to the meeting and did not re-enroll for the Spring 2016 semester.  (See id.)  Plaintiff later reached out to CAPS to set up a meeting with one of its counselors.  (See id.)  She alleges that CAPS did not return her calls or otherwise reach out to her.  (See id.)  Because it was too late to

re-enroll for the Spring 2016 semester, Plaintiff obtained legal counsel in 2017 "to try to entice [the University] to follow the law and cease retaliating against her." (Id. at 10.)

Plaintiff re-enrolled at the University for the Spring 2018 semester by sending in a return from leave letter. (See id.) The University accepted her "letter and re-enrollment, but required her to pay a several hundred dollar fee (which had not been demanded when she had previously returned from leave)." (Id.) Plaintiff "did not sign up for classes" that semester because she was "fearful of further retaliation." (Id.) She again attempted to re-enroll for the Fall 2018 semester by sending "re-enrollment paperwork" that was "identical" to that "which had been previously approved a few months earlier." (Id.) This time, the University allegedly "outright rejected [her] re-enrollment." (See id.)

On April 1, 2020, Plaintiff filed her original Complaint in the Philadelphia Court of Common Pleas. (See id. at 11.) Plaintiff later sought re-enrollment for the Fall 2021 semester and sent the University another "return from leave" letter. (Id. at 11.) But she was again denied re-enrollment unless she paid "thousands of dollars (as opposed to hundreds of dollars demanded prior to the filing of a lawsuit . . .)." (Id.) The University "continues to block [Plaintiff's] re-enrollment unless [she] pays thousands of dollars, which was only demanded after [she] sued [the University], when prior to the suit, [it] only demanded hundreds of dollars." (Id. (emphasis in original).)

**B.    Procedural Background**

On April 1, 2020, Plaintiff filed her original Complaint in the Philadelphia Court of Common Pleas seeking damages from Defendants only for a breach of contract claim. (See Doc. No. 2-1 at 24.) On August 7, 2020, Plaintiff filed a First Amended Complaint that alleged the same breach of contract claim. (See Doc. No. 2-1 at 37.) Then on August 7, 2020, Plaintiff filed

her Second Amended Complaint, adding to her breach of contract claim an alternative remedy for equitable estoppel.  (See id. at 53.)  On September 15, 2020, Plaintiff filed a Third Amended Complaint that identified in separate counts her claims for breach of contract and equitable estoppel.  (See id. at 69-80.)

Finally, on June 8, 2022, Plaintiff filed her Fourth Amended Complaint, which is the subject of the present Partial Motion to Dismiss.  (See id. at 5.)  The Fourth Amended Complaint includes the following claims:

- Count I:  Pennsylvania Common Law Breach of Contract;

- Count II:  Dismissed pursuant to Preliminary Objections Filed in State Court;

- Count III:  A Failure to Accommodate Claim under the Americans with Disabilities Act, in violation of 42 U.S.C. § 12182(A)(ii);

- Count IV:  A Failure to Engage in the Interactive Process Claim under the Americans with Disabilities Act, in violation of 42 U.S.C. § 12182(A)(iii);

- Count V:  Retaliation under the Americans with Disabilities Act, in violation of 42 U.S.C. § 12203;

- Count VI:  Retaliation under Title IX of the Education Amendments of 1972, in violation of 20 U.S.C. § 1681(a);

- Count VII:  Pennsylvania Common Law Negligent Supervision;

- Count VIII:  Pennsylvania Common Law Recklessness;

(Id. at 11-19.)

During the on-the-record hearing on the Partial Motion to Dismiss held on October 28, 2022, Plaintiff's counsel consented to dismissal without prejudice of Counts III and IV.  These Counts will be dismissed without prejudice.  Additionally, Plaintiff does not object to dismissal of

Count VIII as a separate cause of action, and pursuant to Plaintiff's unopposed request, the allegations in that Count will be incorporated into the claim of negligent supervision alleged in Count VII.  (See Doc. No. 4 at 10.)  And since Count II was dismissed by a Common Pleas Court Judge in ruling on Defendants' preliminary objections,[7] only Counts I, V, VI, and VII remain for this Court's consideration on the Partial Motion to Dismiss.

### III.    STANDARD OF REVIEW

The motion to dismiss standard under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted is set forth in Ashcroft v. Iqbal, 556 U.S. 662 (2009).  After Iqbal, it is clear that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to defeat a Rule 12(b)(6) motion to dismiss.  Id. at 678; see also Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007).  "To survive dismissal, 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  Tatis v. Allied Interstate, LLC, 882 F.3d 422, 426 (3d Cir. 2018) (quoting Iqbal, 556 U.S. at 678).  Facial plausibility is "more than a sheer possibility that a defendant has acted unlawfully."  Id. (quotation marks omitted) (quoting Iqbal, 556 U.S. at 678). Instead, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id. (quotation marks omitted) (quoting Iqbal, 556 U.S. at 678).

Applying the principles of Iqbal and Twombly, the Third Circuit Court of Appeals in Lutz v. Portfolio Recovery Assocs., LLC, 49 F.4th 323 (3d Cir. 2022), set forth a three-part analysis

---

[7]   On November 24, 2020, the Court of Common Pleas of Philadelphia County issued an order that sustained "Defendant's Preliminary Objections . . . regarding Plaintiff's equitable estoppel claim."  (Doc. No. 2-1 at 86.)  The Common Pleas Court's Order appears to refer to Plaintiff's Third Amended Complaint, wherein she alleged "in the alternative, a breach [of contract] under the equitable doctrine of estoppel."  (Id. at 78.)

that a district court in this Circuit must conduct in evaluating whether allegations in a complaint

survive a Rule 12(b)(6) motion to dismiss:

> The first step in that process requires an articulation of the elements of the claim.
> . . .   The second step involves reviewing the complaint and disregarding any
> "'formulaic recitation of the elements of a claim' or other legal conclusion," . . . as
> well as allegations that are "so threadbare or speculative that they fail to cross the
> line between the conclusory and the factual[]" . . . .   The third step evaluates the
> plausibility of the remaining allegations.   That involves assuming their veracity,
> construing them in the light most favorable to the plaintiff, and drawing all
> reasonable inferences in the plaintiff's favor.

Id. at 327-28 (citations omitted).  The inquiry is normally broken into three parts: "(1) identifying

the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then

(3) looking at the well-pleaded components of the complaint and evaluating whether all of the

elements identified in part one of the inquiry are sufficiently alleged."  Malleus v. George, 641

F.3d 560, 563 (3d Cir. 2011).

A complaint must do more than allege a plaintiff's entitlement to relief, it must "show"

such an entitlement with its facts.  Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir.

2009) (citing Phillips v. Cnty. of Allegheny, 515 F.3d 224, 234-35 (3d Cir. 2008)).  "[W]here the

well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct,

the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'"  Iqbal,

556 U.S. at 679 (second alteration in original) (citation omitted).  The "plausibility" determination

is a "context-specific task that requires the reviewing court to draw on its judicial experience and

common sense."  Id.

## IV.    ANALYSIS

Defendants Trustees makes several arguments in support of their Partial Motion to Dismiss.

First, they assert that Plaintiff's Title IX retaliation claim fails because there is no causal

connection between her alleged protected conduct and the alleged adverse actions taken against

her by Defendants.  (Doc. No. 2 at 5.)  Second, Defendants argue that Plaintiff's claims are time-barred.[8]  (Id. at 4-5.)  And lastly, Defendants assert that Plaintiff's remaining state law claims fail because (1) she failed to identify a contract that allegedly was breached, and (2) the gist of the action doctrine precludes her from raising tort claims based on her contractual relationship with the University.  (Id. at 5.)

### A.    The Title IX Retaliation Claim Alleged in Count VI Will Not Be Dismissed

In Count VI of the Fourth Amended Complaint, Plaintiff alleges that she engaged in activity protected by Title IX and that the University took adverse action against her because of the protected activity.  (Doc. No. 2-1 at 17.)  Title IX provides, in relevant part that "[n]o person in the United States shall, on the basis of sex, . . . be subjected to discrimination under any education program or activity receiving Federal assistance."  20 U.S.C. § 1681(a).  "[T]his provision prohibits retaliation."  Gomez-Perez v. Potter, 553 U.S. 474, 480 (2008).  In Jackson v. Birmingham Bd. of Educ., the United States Supreme Court held that:

> Retaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination . . . .  Retaliation is, by definition, an intentional act.  It is a form of "discrimination" because the complainant is being subjected to differential treatment.  Moreover, retaliation is discrimination "on the basis of sex" because it is an intentional response to the

---

[8]   Specifically, Defendants refer to an Order from the Common Pleas Court that "based upon the defense of statute of limitations, . . . [t]he averments in Plaintiff's Complaint prior to 2016 are **DISMISSED**."  (Doc. No. 2-1 at 86.)  Defendants further request that this Order "be given full force and effect pursuant to 28 U.S.C. § 1450[.]"  (Doc. No. 2 at 4.)  28 U.S.C. § 1450 states, in relevant part:

> Whenever any action is removed from a State court to a district court, . . . [a]ll injunctions orders, and other proceedings had in such action prior to its removal shall remain in full force and effect until dissolved or modified by the district court.

28 U.S.C. § 1450.  However, for reasons stated supra, regardless of whether the Order is given full effect, the breach of contract claim alleged in Count I will be dismissed because it is barred by the statute of limitations.

nature of the complaint:  an allegation of sex discrimination.  We conclude that
when a funding recipient retaliates against a person <u>because</u> he [or she] complains
of sex discrimination, this constitutes intentional 'discrimination' 'on the basis of
sex,' in violation of Title IX.

544 U.S. 167, 173-74 (2005).

"To state a claim for retaliation under Title IX, the plaintiff must plausibly allege that [s]he
'engaged in activity protected by Title IX, that [s]he 'suffered an adverse action,' and that 'there
was a causal connection between the two.'" <u>Verdu v. Trs. of Princeton Univ.</u>, 2022 WL 4482457,
at *4 (3d Cir. Sept. 27, 2022) (quoting <u>Doe v. Mercy Catholic Med. Ctr.</u>, 850 F.3d 545, 564 (3d
Cir. 2017)).  Here, Plaintiff has plausibly alleged a Title IX retaliation claim.

### 1.    Plaintiff Engaged in Activity Protected by Title IX

Regarding the first prong of a Title IX retaliation claim, Plaintiff engaged in Title IX
protected activity.  A plaintiff alleging retaliation in violation of Title IX "need not prove the merits
of the underlying discrimination complaint, but only that '[s]he was acting under a good faith,
reasonable belief that a violation existed.'" <u>Id.</u> (quoting <u>Aman</u>, 85 F.3d at 1085) (citation omitted).
"To put it differently, if no reasonable person could have believed that the underlying incident
complained about constituted unlawful discrimination, then the complaint is not protected."
<u>Wilkerson v. New Media Tech. Charter Sch.</u>, 522 F.3d 315, 322 (3d Cir. 2008).

"While informal complaints about unlawful discrimination may suffice as protected
activity, the 'message must at a minimum convey the speaker's express or implicit protest of
discriminatory practices that violate the federal anti-discrimination statutes." <u>Atkinson v.
Lafayette Coll.</u>, 653 F. Supp. 2d 581, 595-96 (E.D. Pa. 2009) (citation omitted).  "Protected
activities include complaints of sexual discrimination to the courts, government agencies, or the
funding recipient." <u>Johnston v. Univ. of Pittsburgh of the Commonwealth Sys. of Higher Educ.</u>,
97 F. Supp. 3d 657, 682 (W.D. Pa. 2015) (citing <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 548

U.S. 53, 68 (2006)).  Cf. Simonetta v. Allegheny Coll., No. 20-32, 2021 WL 927534, at *5 (E.D. Pa. Mar. 11, 2021) (holding that the plaintiff engaged in Title IX-protected activity when "she reported her teammate's sexual harassment to [an Allegheny College assistant football coach]").

As noted in the Fourth Amended Complaint, Plaintiff alleges the following protected activities:

> . . . [Plaintiff's] lawyer had numerous phone conferences with various [] officials [at the University], during which he, upon information and belief, further references [Plaintiff's] denied accommodations, as well as [Dr. Alexander's] predatory sexual behaviors as described in this lawsuit.

(Doc. No. 2-1 at 10.)  Additionally, Plaintiff alleges she engaged in protected activity when she filed her original complaint in the Philadelphia Court of Common Pleas on April 1, 2020 referencing Dr. Alexander's inappropriate sexual conduct.  (See id. at 10-11.)

Accepting the facts alleged in the Fourth Amended Complaint as true, Plaintiff has shown that she engaged in protected activity by protesting in good faith "discriminatory practices that violate the federal anti-discrimination statutes" when her counsel contacted the University describing the predatory sexual behavior of Dr. Alexander and subsequently filed a lawsuit on April 1, 2020 alleging the same sexual misconduct by Dr. Alexander.  Atkinson, 653 F. Supp. 2d at 595-96.  Therefore, the first prong of Plaintiff's Title IX retaliation claim is met here.

### 2.        Plaintiff Suffered an Adverse Action by Defendants

Plaintiff also has plausibly alleged that she suffered an adverse action—the second prong of a Title IX retaliation claim.   Under a Title IX retaliation claim, adverse action must be "materially adverse" such that it "might well have dissuaded a reasonable [person in the plaintiff's position] from making or supporting a charge of discrimination."  White, 548 U.S. at 68-70.  And while "petty slights or minor annoyances" against the plaintiff generally are not considered

materially adverse, they might constitute adverse action if the surrounding facts and circumstances would "deter a reasonable employee from complaining about discrimination." Id. at 68-69.

Plaintiff alleges that the University took the following adverse actions against her:

When [Plaintiff] provided [the University] with the same "return from leave" letter just prior to the Fall 2021 semester (after suing [the University]), [the University] blocked the re-enrollment unless [she] paid thousands of dollars (as opposed to hundreds of dollars demanded prior to the filing of a lawsuit yet after the privately communicated protected activity, as compared to after the public protected activity of a lawsuit in open court).

. . . [The University] continues to block [Plaintiff's] re-enrollment unless [she] pays thousands of dollars, which was only demanded after [she] sued [the University], when prior to the suit, [it] only demanded hundreds of dollars.

(Doc. No. 2-1 at 11.)  Viewing the allegations contained in the Fourth Amended Complaint as true, Plaintiff has identified conduct by Defendants that would dissuade a reasonable student in her position from filing or continuing to support a lawsuit alleging discrimination in violation of Title IX.

Plaintiff was not required to pay "a several hundred dollar fee" until after her counsel contacted University officials referencing Dr. Alexander's predatory sexual behaviors.  (Id.) Rather than pay the several hundred-dollar fee and because she was "fearful of further retaliation," Plaintiff did not enroll for classes for the Spring 2018 semester.  (See id.)  And when Plaintiff had attempted to re-enroll for the Fall 2018 semester, the University "outright rejected" her request. (Id.)  Furthermore, after filing her lawsuit on April 1, 2020, the University required Plaintiff to pay a several thousand-dollar fee in order to be re-enrolled for the Fall 2021 semester.[9]  (See id. at 11.)

The University's requirement that a student engaging in Title IX-protected activity, including the filing of a lawsuit referencing sexual misconduct by one its employees, pay a several

---

[9]  Plaintiff does not state when she applied for re-enrollment for the Fall 2021 semester.

thousand-dollar fee it never requested prior to that student engaging in such activity would discourage a reasonable student from pursuing sex discrimination claims against the University or its employees.   Accordingly, Plaintiff has plausibly alleged that she suffered materially adverse action.

### 3.   There Is a Causal Connection Between Plaintiff's Protected Activity and Defendants' Adverse Action Against Her

Plaintiff maintains that she has alleged sufficient facts that, taken as true, show that there is a causal connection between the filing of her lawsuit in state court on April 1, 2020 referring to Dr. Alexander's sexual misconduct and the University's refusal to re-enroll her for the Fall 2021 semester unless she paid a several thousand dollar fee.  Specifically, she contends that Defendants' "retaliatory actions increased as the intensity of [her] protected activity increased."  (Doc. No. 4 at 7.)

Defendants, on the other hand, maintain that six years had elapsed between Plaintiff's purportedly protected activity and Defendants' alleged adverse action against her which "severs the causal chain that is required to prove retaliation."  (Doc. No. 2 at 13.)  However, the fact is that Plaintiff's lawsuit filed on April 1, 2020 by her attorney against the University alleging that Dr. Alexander engaged in unlawful sexual conduct against her is the protected activity at issue here. Furthermore, the alleged adverse action here is that the University now required Plaintiff to pay after filing her lawsuit a several thousand-dollar fee to be re-enrolled for the Fall 2021 semester. It never required Plaintiff to pay a fee in that amount while she was a student at the University until after she had filed a lawsuit.

"[A] plaintiff may rely on 'a broad array of evidence' to demonstrate the causal link between [the] protected activity and the adverse action taken."  Carvalho-Grevious v. Del. State Univ., 851 F.3d 249, 260 (3d Cir. 2017) (internal quotation marks omitted) (quoting Marra v. Phila.

Hous. Auth., 497 F.3d 286, 302 (3d Cir. 2007) (citation omitted)).  As the court in Carvhalho-Grevious explained:

> She can meet this burden by proferring evidence of [the defendant's] inconsistent explanation for taking adverse [] action, Waddell v. Small Tube Prods., Inc., 799 F.2d 69, 73 (3d Cir. 1986), a pattern of antagonism, Woodson[ v. Scott Paper Co., 109 F.3d 913, 921 (3d Cir. 1997)], or temporal proximity "unusually suggestive of retaliatory motive," Shaner v. Synthes, 204 F.3d 494, 505 (3d Cir. 2000) (internal quotation marks omitted).  These are not the exclusive ways to show causation, as the proffered evidence, looked at as a whole, may suffice to raise the inference." Kachmer[ v. SunGard Data Sys., Inc., 109 F.3d 173, 177 (3d Cir. 1997).

Id.  While the temporal proximity between Plaintiff's protected activity and Defendants' adverse action against her is not, by itself, "unusually suggestive of retaliatory motive," the underlying circumstances establish a pattern of antagonism.  See Watson v. Rozum, 834 F.3d 417, 424 (3d Cir. 2016) ("[W]here the temporal proximity is not so close at to be 'unduly suggestive,' the appropriate test is 'timing plus other evidence.'") (citation omitted).[10]

---

[10] In Robinson v. Southeastern Pa. Transp. Auth., the plaintiff filed a union grievance and a Pennsylvania Human Rights Commission ("PHRC") complaint in February 1984 against the Southeastern Pennsylvania Transportation Authority ("SEPTA") alleging race discrimination. 982 F.2d 892, 894 (3d Cir. 1993).  Additionally, the plaintiff wrote to his Congressman in mid-1985 and to his supervisor in November 1985 complaining of alleged racial discrimination.  Id. He was terminated on December 24, 1985.  Id.  SEPTA claimed "that events occurring in early 1984 were too remote from his December 24, 1985 dismissal to be considered a cause of his termination."  Id.

The Third Circuit Court of Appeals upheld the trial judge's conclusion that there was a causal connection between the plaintiff's complaints of racial discrimination and his termination by SEPTA.  Specifically, the Third Circuit stated:

> The temporal proximity noted in other cases . . . is missing here and we might be hard pressed to uphold the trial judge's finding were it not for the intervening pattern of antagonism that SEPTA demonstrated.  As the trial judge found, SEPTA subjected Robinson to a "constant barrage of written and verbal warnings . . ., inaccurate point totalings, and disciplinary action, all of which occurred soon after plaintiff's initial complaints and continued until his discharge."  The court could reasonably find that the initial series of events thus caused Robinson's and SEPTA's relationship to deteriorate, and set a pattern of behavior that SEPTA followed in retaliating against Robinson's later efforts at opposing the Title VII

Here, a pattern of antagonism establishes the causal connection at the motion to dismiss stage. Viewing the facts in the light most favorable to Plaintiff, the facts show that she made claims against Dr. Alexander in 2015 regarding his predatory sexual behavior and the University threatened on two different occasions to have Plaintiff arrested if she continued making reports about Dr. Alexander.[11] Then, Plaintiff retained an attorney who contacted University officials some time in 2017 regarding Dr. Alexander's sexual misconduct. When Plaintiff attempted to re-enroll for the Spring 2018 semester,[12] she was for the first time required to pay a several hundred-dollar fee before her re-enrollment could be approved. This "initial series of events thus caused" Plaintiff's and the University's "relationship to deteriorate." Robinson, 982 F.2d at 895.

This deteriorated relationship established the foundation of the "pattern of behavior that" the University "followed in retaliating against" Plaintiff's "later efforts at opposing the Title [IX] violations [s]he perceived." Id. Plaintiff "applied to be re-enrolled at [the University] for the Fall 2018 semester, but [the University], outright rejected [her] re-enrollment despite [the fact] that it was identical to her previous re-enrollment paperwork which had been previously approved a few

---

violations he perceived. Cf. Andrews v. City of Philadelphia, 895 F.2d 1469, 1484 (3d Cir. 1990) ("A play cannot be understood on the basis of some of its scenes but only on its entire performance, and, similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario."). Because these events do not stand alone in this case, we cannot say that the trial court's finding of a causal link is clearly erroneous.

Id. at 895 (footnote omitted).

[11] The first time the University threatened Plaintiff was "[a]lmost immediately after [she] reported" Dr. Alexander to his supervisor and the University President. (Doc. No. 2-1 at 8.) The second time occurred when Plaintiff met with Hikaru Kozuma, who presumably was an administrator at the University. Plaintiff alleges that at the same time as this meeting, University police "ransacked" her off-campus apartment and removed from it a prescription written by Dr. Alexander and a list of grievances against the University written by Plaintiff. (Id.)

[12] The Fourth Amended Complaint does not state whether she attempted to re-enroll for the Fall 2017 semester or whether the University permitted Plaintiff to re-enroll for that semester.

months earlier." (Doc. No. 2-1 at 10.) On April 1, 2020, Plaintiff filed a lawsuit against Defendants referencing Dr. Alexander's sexual misconduct. She later attempted to re-enroll for the Fall 2021 semester.[13] The University required that she pay thousands of dollars to be re-enrolled as opposed to the hundreds it requested before she filed her lawsuit.[14] The University continues to request that Plaintiff pay the required several thousand-dollar fee before Plaintiff can re-enroll. These facts, accepted as true, show a pattern of antagonism that establish a causal connection between Plaintiff's Title IX-protected activity and the University's imposition of a large re-enrollment fee. Plaintiff has therefore plausibly alleged a claim for Title IX retaliation.

### 4.     Plaintiff's Title IX Claim Is Not Time-Barred

Defendants claim that Plaintiff's Title IX retaliation claim is time-barred on the face of the Fourth Amended Complaint. Under Pennsylvania law, Title IX claims are governed by a two-year statute of limitations.[15] See Doe v. Mercy Catholic Med. Ctr., 850 F.3d 545, 564 (3d Cir. 2017) (citing Bougher v. Univ. of Pittsburgh, 882 F.2d 74, 78 (3d Cir. 1989) (concluding that Title IX claims are governed by "Pennsylvania's two year statute of limitations period applicable to

---

[13] Again, Plaintiff does not state whether she attempted to re-enroll for the Fall 2020 semester.

[14] Before she reported Dr. Alexander's misconduct to the University, whenever Plaintiff sent the University a return from leave letter, she was never required to pay a fee before re-enrolling.

[15] As the Third Circuit held in Oshiver v. Levin, Fishbein, Sedran & Berman:

> While the language of Fed. R. Civ. P. 8(c) indicates that a statute of limitations defense cannot be used in the context of a Rule 12(b)(6) motion to dismiss, an exception is made where the complaint facially shows noncompliance with the limitations period and the affirmative defense clearly appears on the face of the pleading.

38 F.3d 1380, 1384 n.1 (3d Cir. 1994).

personal injury actions, 42 Pa. Cons. Stat. §5524").  In <u>Kach v. Hose</u>, the Third Circuit explained

when a cause of action accrues:

> Federal law governs a cause of action's accrual date.  <u>Genty v. Resolution Trust Corp.</u>, 937 F.2d 899, 919 (3d Cir. 1991).  Under federal law, a cause of action accrues, and the statute of limitations begins to run, "when the plaintiff knew or should have known of the injury upon which its action is based." <u>Sameric Corp. v. City of Philadelphia</u>, 142 F.3d 582, 599 (3d Cir. 1998) (citation omitted); <u>see</u> <u>also</u> <u>Montgomery v. De Simone</u>, 159 F.3d 120, 126 (3d Cir. 1998).  The determination of the time at which a claim accrues is an objective inquiry; we ask not what the plaintiff actually knew but what a reasonable person should have known.  <u>Barren v. United States</u>, 839 F.2d 987, 990 (3d Cir. 1988).  As a general matter, a cause of action accrues at the time of the last event necessary to complete the tort, usually at the time the plaintiff suffers an injury.  <u>See</u> <u>United States v. Kubrick</u>, 444 U.S. 111, 120 (1979).  "The cause of action accrues even though the full extent of the injury is not then known or predictable.  Were it otherwise, the statute would begin to run only after a plaintiff became satisfied that he had been harmed enough, placing the supposed statute of repose in the sole hands of the party seeking relief." <u>Wallace</u>[ <u>v. Kato</u>, 549 U.S. 384,] 391 [(2009)] (internal quotation marks and citations omitted).

589 F.3d 626, 634-35 (3d Cir. 2009).

Generally, the statutory period for Title IX retaliation claims does not start to run until the

"allegedly retaliatory conduct" occurs.  <u>Doe</u>, 850 F.3d at 564.  Thus, Plaintiff's Title IX retaliation

claim must be brought within two years of when she should have known that Defendants retaliated

against her.

Plaintiff alleges that Defendants' adverse action occurred when "just prior to the Fall 2021

semester" the University "blocked [her] re-enrollment unless [she] paid thousands of dollars (as

opposed to the hundreds of dollars demanded prior to the filing of a lawsuit yet after the privately

communicated protected activity, as compared to after the public protected activity of a lawsuit in

open court)."  (Doc. No. 2-1 at 11.)  Thus, the statute of limitations began to run some time in

2021.  Plaintiff filed the Fourth Amended Complaint alleging, among other claims, Title IX

retaliation on June 6, 2022.[16]  Regardless of when exactly in 2021 the University rejected her re-enrollment unless Plaintiff paid thousands of dollars, her Title IX retaliation claim is timely because it was filed within two years of the University's alleged retaliatory act.  Therefore, because this claim does not appear on the face of the Fourth Amended Complaint to be barred by the applicable statute of limitations, Count VI is not time-barred and will survive the Partial Motion to Dismiss.[17]

**B.     The Breach of Contract Claim Alleged in Count I Will Be Dismissed for Violation of the Statute of Limitations**

Defendants submit that the breach of contract claim in Count I violates the statute of limitations.  In this Count in the Fourth Amended Complaint, Plaintiff alleges that the University breached a contract that existed between her and the University.  She relies as the contract on a print-out of a web page relating to student's Health and Wellness at the University in which several promises are made on providing healthcare to students.[18]  (See Doc. No. 2-1 at 44-45.)  She claims

---

[16]  Although Plaintiff filed her original Complaint in state court on April 1, 2020, as noted above, she alleged Title IX retaliation for the first time in the Fourth Amended Complaint filed on June 6, 2022.

[17]  Defendants also assert that "Plaintiff's newly-added claims [which include the ADA retaliation claim] are . . . time-barred on the face of the Complaint."  (Doc. No. 2 at 11.)  In Count V, Plaintiff asserts in her ADA retaliation claim that she suffered the same adverse actions by Defendants as she did regarding her Title IX retaliation claim.  Accordingly, for the same reasons that Plaintiff's Title IX claim is timely, her ADA retaliation claim is timely.  The ADA claim also has a two-year statute of limitations.  See Disabled in Action v. SEPTA, 539 F.3d 199, 208 (3d Cir. 2008).  Therefore, the Motion to Dismiss will be denied as to Count V.

[18]  Specifically, Plaintiff asserts that "[a] contract exists in this case, pursuant to [the University's] statements, accepted by [Plaintiff], that [the University] would provide [her] with 'free' and 'very good' healthcare."  (Doc. No. 2-1 at 12.)  Additionally, Plaintiff avers that the University made the following five promises:

    a.  "confidential free professional mental healthcare";

    b.  "a core [PENN] priority" to "emphasize holistic health that considers safety, happiness, mental health, resilience, and financial well-being";

that Defendants breached each of these promises by offering the services of Dr. Alexander.  (See id. at 12-13.)  The breaches occurred in 2015.

"Pennsylvania imposes a . . . four-year statute of limitations for breach of contract claims[.]"  In re Olick, 829 F. App'x 586, 588 (3d Cir. 2020) (citing 42 Pa. C.S. § 5525(a)).  The acts alleged in the Count I breach of contract claim all occurred some time in 2015 when Plaintiff reported Dr. Alexander's misconduct to the University.  Specifically, the latest conduct she alleges as part of her breach of contract claim—Defendants' retention of Dr. Alexander after reporting his misconduct to the University—occurred in 2015.  But Plaintiff filed her original Complaint in state court alleging breach of contract on April 1, 2020, which is beyond the four-year statute of limitations.  Accordingly, because Count I's breach of contract claim is untimely, it will be dismissed as time-barred.[19]

---

     c.  "a dedicated team" that "is committed to the health and well-being of [PLOEGER], and providing safe, accessible, cost-effective, culturally-sensitive, and [PLOEGER]-focused care";

     d.  "state-of-the-art medical and counseling centers" which are designed to "provide high-quality, compassionat (sic) care for [PLOEGER] during [her] academic journey"; and

     e.  "The bottom line?  You [PLOEGER] are not alone.  And there is hope."

(Doc. No. 2-1 at 12 (alterations in original).)  The first two of these quotes are taken directly from the web page titled "Health and Wellness."  The third and fourth quoted provisions appear to come from a different web page available at https://wellness.upenn.edu/student-health-and-counseling.  This web page is not attached to the Fourth Amended Complaint or any other amended pleading.  The last quoted provision is found at https://wellness.upenn.edu/counseling/caring-yourself-and-others-stress-distress-and-crisis, an entirely different web page not attached to any pleading.  It also should be noted that each quote refers to University of Pennsylvania students generally and are located on the University's website on pages covering student health services.

[19] Because the breach of contract claim in Count I is being dismissed as untimely filed, there is no need to decide whether a contract existed in the first place.

### C.    Plaintiff's Negligent Supervision Claim Alleged in Count VII Also Is Barred by the Statute of Limitations

Defendants contend that the negligent supervision claim alleged in Count VII should be dismissed because it is barred by the statute of limitations.  In this Count, Plaintiff alleges that the University "breached its duty of care" owed to her to "ensure that the performance of its employees' duties are completed without violating the contractual and/or civil rights of, inter alia, [Plaintiff]," specifically "by allowing its employees to breach contracts, discriminate and retaliate against [her]" and failing to take corrective action in preventing further discrimination and retaliation.  (Doc. No. 2-1 at 18-19.)  Defendants, however, assert that this claim is barred by (1) the gist of the action doctrine[20] and (2) the two-year statute of limitations for negligence claims.

Under Pennsylvania law, a claim for negligent supervision must be brought within two years of the allegedly violative conduct.  See Ormsby v. Luzerne Cnty. Dept. of Public Welfare, 149 F. App'x 60, 62 (3d Cir. 2005) ("[C]laims for negligence supervision . . . brought in Pennsylvania are also governed by [the] two year limitations period [provided by 42 Pa. C.S. § 5524].").  Plaintiff's negligent supervision claim accrued "[i]n or around 2015" when she reported Dr. Alexander's misconduct and the University took no action against him.  (Doc. No. 2-1 at 7.) Plaintiff asserted for the first time her negligent supervision claim in Count VII in the Fourth Amended Complaint, which was filed on June 6, 2022.  Therefore, since the Fourth Amended Complaint was filed more than two years after she reported Dr. Alexander's misconduct to the University and the University failed to supervise or terminate him, Count VII will be dismissed as untimely.

---

[20]  And because the negligent supervision claim will be dismissed as untimely filed, the gist of the action doctrine need not be addressed.

## V.    CONCLUSION

For the foregoing reasons, Defendants' Partial Motion to Dismiss the Fourth Amended Complaint (Doc. No. 2) will be granted in part and denied in part.  The claims that remain in this case are retaliation under the ADA (Count V) and retaliation under Title IX (Count VI).  The claims that are dismissed or terminated are breach of contract (Count I), failure to accommodate under the ADA (Count III), failure to engage in the interactive process under the ADA (Count IV), negligent supervision (Count VII), and recklessness (Count VIII).  An appropriate Order follows.