IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| April Ploeger, | : |
|                Plaintiff, | : **Civil Action** |
| v. | : **No. 2:22-cv-2389-JHS** |
| The Trustees of the University of Pennsylvania, | : |
|                Defendant. | : |

**DEFENDANT'S SUPPLEMENT TO ITS MOTION FOR SUMMARY JUDGMENT**

Defendant, The Trustees of the University of Pennsylvania, submits this supplement to its Motion for Summary Judgment filed on December 27, 2024 (doc. 36), in accordance with the Court's Amended Scheduling Order (doc. 59).

Despite being permitted four additional depositions after the close of discovery, Plaintiff still has failed to elicit any evidence of retaliation against her. There has been no evidence at all that anyone at Penn who played any role in Plaintiff's efforts to re-enroll was even aware of any protected activity by Plaintiff. What's more, Plaintiff has established no causal connection between any protected activity and any adverse action. Retaliation claims require all three elements: (1) protected activity, (2) adverse action, and (3) a causal connection between the protected activity and the adverse action. Montanye v. Wissahickon Sch. Dist., 218 Fed. Appx. 126, 131 (3d Cir. 2007). Plaintiff's failure to provide any one of these elements is fatal to her claim.

**A. Plaintiff Failed to Follow Penn's Process for Requesting Reasonable Accommodations, and There is No Causal Connection Between Plaintiff's Accommodations Process (or Complaints About It) and Plaintiff's Ability to Re-Enroll at Penn.**

Penn's accommodations process begins with the student self-identifying as someone with a disability who needs accommodations. (Deposition of Ryan Miller, Apr. 7, 2025 ("Miller Dep."), excerpts of which are attached as Exhibit 64, at 57:8-14.) Once the student submits the required forms to the Students with Disabilities Services office ("SDS"), SDS's interactive process can commence. (Id. at 57:11-62:17.) An SDS disability specialist will schedule a meeting with the student for a collaborative interview, the goal of which is to speak with the student about their disability or condition, the history of the disability or condition, and barriers to access that they may have experienced. (Id. at 57:24-59:2.) Through its interactive process, SDS seeks to get to know the student and determine how best to help the student get the accommodations they need. (Deposition of Susan Shapiro, May 22, 2025 ("Shapiro Dep."), excerpts of which are attached as Exhibit 65, at 25:21-26:2 ("It's one part of the process that we use to try to understand if there is a disability, the impact of the disability om students' – how they were limited in major life functions."), 27:5-17 (describing the "collaborative interactive process where we really want to get to know the student, what their needs are, what they're asking for, their concerns so that we can most appropriately accommodate them.").) Students must submit documentation (medical or otherwise) to support their need for accommodations. (Id. at 25:16-20.) As part of its interactive process, if SDS has additional questions after receiving the documentation, or if the documentation is insufficient, the disability specialist may reach out to the student for more information. (Miller Dep. at 59:10-14.)

2

SDS reviews the documentation, consults with medical professionals if necessary, and makes a determination of the student's accommodations based on all of the information available – whether to grant accommodations, and if so, what accommodations to grant.  (Id. at 61:24-62:11.)  Once the student's accommodations are determined, SDS notifies the student's professors of the accommodations, without disclosing any underlying medical information.  (Miller Dep. at 79:18-22.)  Students are encouraged to meet with their professors to discuss the accommodations.  (Id. at 60:22-61:2.)  Students can also decide whether they want all of the same accommodations in every class.  (Id. at 79:6-80:3.)

SDS's practice is to hold the collaborative interviews in person.  (Id. at 81:3-82:6; Shapiro Dep. at 69:19-23 ("Our practice was to meet with students.  It's the humanistic process to met and get to know a student.  And a lot is missed through an e-mail.  A lot is misinterpreted.  Our practice was to meet with students.").  If a student refuses to meet with SDS, then the interactive process cannot move forward.  (Miller Dep. at 194:20-195:7.)  SDS's collaborative interactive process does not involve lawyers because the goal of the meeting is to get to know the student and the student's needs; it is not, and is not intended to be, a legal process.  (Id. at 200:6-8 ("the accommodation process is not a legal process."); Shapiro Dep. at 33:13-17 ("This is a process. If a lawyer is involved, it becomes a legal process and -- and our legal counsel has to be involved in that process. But that's not how we practice. Our practice is to determine accommodations. It's not a legal process.").)

In this case, Plaintiff had followed Penn's process in requesting, and being granted, reasonable accommodations in 2008 in the form of (i) alternative test locations

3

to reduce distractions, (ii) extended test-taking time, and (iii) 50% more time for in-class tests and quizzes. (Exhibit 12 [D_000024].) Again in 2012, Plaintiff had followed Penn's process in requesting, and was granted, the same reasonable accommodations. (Exhibit 17 [D_000022].) But in 2016, Plaintiff failed to engage in the interactive process with SDS, refusing to meet with SDS without a lawyer or advocate present. (Dep. Exhibit 68/Feb. 9-10, 2016 emails, attached as Exhibit 26; Miller Dep. at 194:20-195:7; Shapiro Dep. at 31:11-18 ("I asked several times to meet April because that's really a crucial part in our being able to determine accommodations is to be able to speak with the student, see what the accommodations are that the student's requesting, understanding the impact of her disability, her perspective, and really to understand her and be able to make appropriate decisions in going to provide her with access.").) SDS also requested documentation from Plaintiff but did not receive the documentation requested.[1] (Shapiro Dep. at 76:9-77:7, 81:5-10 ("We needed updated documentation. I believe that was based on much older documentation. And we need to take a look. We didn't refuse to give her the accommodation. We needed updated documentation which we asked for repeatedly and did not receive.").) SDS requested to meet with Plaintiff several times, as that meeting was a "crucial part of our process." (Id. at 31:11-18.) Plaintiff failed to follow Penn's process when she refused to meet with SDS without a

---

[1] Similarly, in 2018, when the Committee on Leaves and Returns was evaluating Plaintiff's request to return from leave, Plaintiff did not submit updated paperwork. Rather, she submitted the same form three times in a row, showing a failure to meaningfully participate in the process or to follow the specific guidance provided to her about how to return to school. (Pansing Dep. at 182:10-183:19 ("the purpose of the return request is to meet the student where they are, hear what they're doing at the time, work with them on what's going on at the time. So a three-year-old request or two-year-old request is not -- not really relevant and wasn't considered participating fully in the process."), 249:2-5.)

4

lawyer or advocate and failed to provide appropriate supporting documentation. Therefore, SDS could not complete the process for determining reasonable accommodations. (Miller Dep. at 194:20-195:7.)

Plaintiff will contend that it was Penn, and not Plaintiff, who shut down the interactive process. As set forth above, that is not accurate or supported by the evidence. But even if the Court were to make such a finding (which it should not), Plaintiff's retaliation claims still fail because Plaintiff elicited no testimony whatsoever that could link any of SDS's conduct to that of the University's Student Registration & Financial Services (which is responsible for determining a student's financial obligations to the University), which Plaintiff claims was retaliatory.

**B. Plaintiff's Financial Obligations Pre-Date Any Alleged Protected Activity, and there is no Causal Connection Between Any Alleged Protected Activity and Plaintiff's Ability to Re-Enroll at Penn.**

Multiple employees in Penn's Student Registration and Financial Services unit/office ("SRFS") communicated with and worked with Plaintiff over many years to clear up her financial issues, which would have cleared the path to re-enrollment. (Deposition of Elaine Varas, Apr. 14, 2025 ("Varas Dep."), excerpts of which are attached as Exhibit 66, at 73:16-74:19.) SRFS's actions with respect to Plaintiff's loan (the "thousands" of dollars that came due) were based on objective factors that were based on the terms of the loan, which defined eligibility for deferment, and forbearance period and repayment schedule, among other terms. Going back to at least 2009, Plaintiff was expected to pay outstanding financial obligations in order to return to school. (Id. at 88:23-91:1.) Plaintiff, unfortunately, did not address her financial issues and instead engaged in a pattern of asking the same questions over and over, while

5

accusing Penn offices of failing to respond to her inquiries though they had done so. (Id.; see also id. at 217:7-24, 232:19-233:15, 244:24-245:8. See also Deposition of David Wallace Pansing, Apr. 11, 2025 ("Pansing Dep."), excerpts of which are attached as Exhibit 67, at 207:22-208:1 ("I had been working with April, she often sent a follow up email that didn't accept what the original email responded – had responded"), 227:22-228:22 (testifying that he knew Plaintiff's accusation of not hearing from Penn for "months" to be false when he, himself, had replied to her email the month before).)

Plaintiff was placed on a collection hold in 2016 because she owed money on both (i) a student loan[2], and (ii) her student account. (Id. at 76:4-78:8.) That 2016 collection hold was temporarily lifted when Plaintiff assured Penn that she intended to make payments. (Id. at 78:14-79:6 ("She explained that she had every intention of making good on those payments and we wanted to work with her… We allowed her to move forward but we never received the payment.").) Plaintiff charged numerous items to her student account, including items at the Penn bookstore, telephone services, and cash advances – all of which contributed to the money owed on her student account. (Id. at 154:12-21, 155:10-156:18, 163:4-13.) Plaintiff then incurred late fees as a result of these charges. Over time, Penn attempted to work with Plaintiff by reducing or eliminating certain late fees. (Id. at 81:19-82:10 (discussing the reduction or elimination

---

[2] Plaintiff was given a student loan in 2012 and 2014 to cover her medical expenses. (Varas Dep. at 108:1-110:21.) In 2012, the loan was for $8,000; in 2014, the loan was for $12,000. (Id. at 110:22-111:3.) The 2012 loan was repaid, but the 2014 loan was not repaid. (Id. at 119:5-10.) As Mr. Sessa's 2018 memo to Plaintiff explained, Plaintiff's 2014 loan had been put into forbearance twice, thereby allowing Plaintiff to not make payments for almost eight months so that she could "collect herself and she could do what she needed to do. However, since she didn't make payments after it came out of forbearance, the deferment process was no longer available to her and that she now needed to make payments towards the loan." (Exhibit 50; Varas Dep. at 240:5-16.)

of late fees in at least 2012 and forward), 83:22-23 ("our intention is to continue to help support students"), 178:4-11 ("We took late fees off.  We took collection fees off.  We did a lot of things to help her not have such a high balance.").)  By 2018, when Plaintiff received a letter from Matthew Sessa, Executive Director of Student Registration and Financial Services, Plaintiff owed Penn thousands of dollars on her student loan and hundreds more dollars on her student account.  (Id. at 79:20-80:2; Exhibit 50 [Sessa letter]; Exhibit 51 [student account].)

       Thus, contrary to her allegation that Penn artificially increased the amount Plaintiff owed in response and retaliation for  her request for accommodations, reporting of sexual misconduct, or filing of a lawsuit in April 2020 (Fourth Amended Complaint at ¶¶ 54, 55), Plaintiff owed Penn thousands of dollars long before any alleged protected activity and failed to clear it up as required and as promised.  (Varas Dep. at 78:14-79:6.)  And, significantly, Plaintiff elicited no testimony at all about whether Penn's SFS team was even aware of Plaintiff's lawsuit filed in April 2020, her requests for accommodations, or her alleged reporting of any sexual misconduct.  Only SFS can remove  financial holds from a student's account.  (Pansing Dep. at 206:23-24.)  Absent any causal connection linking the alleged protected activity with the alleged adverse action, Plaintiff's retaliation claims fail.

For the foregoing reasons, and the reasons set forth in Penn's Motion for Summary Judgment (doc. 36), Penn respectfully requests that the Court grant the instant Motion, enter summary judgment in Penn's favor, and dismiss this case with prejudice.

|  |  |
|---|---|
|  | Respectfully submitted, |
|  | **TUCKER LAW GROUP, LLC** |
| Date: June 10, 2025 | /s/ Leslie Miller Greenspan |
|  | Joe H. Tucker, Jr., Esquire |
|  | Leslie Miller Greenspan, Esquire |
|  | 1801 Market Street, Suite 2500 |
|  | Philadelphia, PA 19103 |
|  | (215) 875-0609 |
|  | Attorneys for Defendant, |
|  | The Trustees of the University of Pennsylvania |

## **CERTIFICATE OF SERVICE**

I, Leslie Miller Greenspan, Esquire certify that on this date, I caused a copy of the foregoing document to be electronically filed through the Court's ECF System and that a notice of electronic filing will be generated to the following counsel of record, thereby constituting service of the document:

Mart Harris, Esquire
The Trial Law Firm, LLC
428 Forbes Avenue, Suite 1700
Pittsburgh, PA 15219
MH@TLawF.com

**TUCKER LAW GROUP, LLC**

/s/ Leslie Miller Greenspan
Leslie Miller Greenspan, Esquire