# EXHIBIT 64

```
           IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF PENNSYLVANIA

                    PHILADELPHIA DIVISION



APRIL PLOEGER,                        Case No.
                                      2:22-CV-02389-JHS

        Plaintiff,


    v.


TRUSTEES OF THE UNIVERSITY
OF PENNSYLVANIA,


        Defendants.




                           - - -

        ZOOM DEPOSITION OF MARCUS RYAN MILLER

                    APRIL 7, 2025

                           - - -








                      Reported by:
          Kim Simms Strnisa - Court Reporter
                 1424 Roosevelt Road
                Pittsburgh, PA  15237
         412.969-4506 - jeanne@strideaway.net
```

57

1   accommodations -- were there any changes to
2   that process from 2015 through 2020?
3        A.   Not to my knowledge.
4        Q.   Do you know whether there had been
5   any changes in the process since 2020?
6        A.   No, I don't believe there's been any
7   changes to the process.
8        Q.   So let's talk about, generally, the
9   process of obtaining accommodations.
10            What happened first?
11       A.   What happens first?  A student would
12  self-identify with Student Disability Services
13  as a person who has a disability or who may
14  need accommodations.
15            So, during the period we're
16  discussing, they would complete a
17  self-identification form -- a self-I.D. form,
18  and submit it to our office.  The self-I.D.
19  form asks about the nature of the student's
20  disability or -- and/or medical condition, and
21  any accommodations they believed may address
22  any access barriers to their participation in
23  the educational activities at the University.
24            And then after that
25  self-identification form is received, the

58

1    student -- the student is instructed to
2    schedule an initial meeting with a disability
3    specialist at the Weingarten Center.
4             The disability specialist -- and the
5    student also has the opportunity before that
6    meeting, but also afterwards, or really at any
7    point, to submit any documentation that they
8    believe is relevant regarding their disability
9    or medical condition.
10            And then the disability specialist
11   engages in a -- what was -- what we call the
12   collaborative interview.  So they talk to the
13   student about their -- the nature of their
14   disability or medical condition, their history
15   with that disability or medical condition, the
16   access barriers that they may have experienced
17   in the past, but also that they anticipate
18   experiencing or are currently experiencing at
19   Penn.
20            They discuss the student's history,
21   if -- if it exists, of accommodations in prior
22   educational settings, the impact of the
23   disability in those settings and the impact of
24   those accommodations.  And then they may
25   discuss -- the disability specialist may have

59

1   additional questions pertaining to
2   documentation that the student submitted.
3           The disability specialist would then
4   -- so after that initial meeting, may meet
5   with a documentation review committee,
6   essentially, that was -- included other
7   disability specialists in the office.
8           So this wasn't for every
9   accommodation request, but maybe more complex
10  ones.  They would discuss the documentation
11  provided, the student's medical condition or
12  disabilities, and any information that was
13  shared by the student in the collaborative
14  interview.
15          Then the disability specialist would
16  make a decision about the approval or denial
17  of accommodations and inform the student.
18          If the student is approved for
19  accommodations, they would -- this is where
20  the languages change a little bit.  We
21  currently call it a semester request.  I think
22  it was maybe a course roster, maybe, is how we
23  described it before.  But the function is the
24  same.
25          So, if the student is approved for

60

1    accommodations, they may be -- they then have
2    to elect, if it's an academic accommodations,
3    if they want to apply those academic
4    accommodations to specific courses each
5    semester.
6              So usually this involves a follow-up
7    meeting at the beginning of a new semester
8    with a disability specialist.  And the
9    student, you know, if they have multiple
10   accommodations approved, they decide which
11   accommodations to apply to which courses, and
12   notify the disability specialist.
13             And then the disability specialist
14   would then send out letters to the instructors
15   of those courses, notifying them of --
16   notifying the instructor of -- that this
17   student is in your course and is approved for
18   the following academic accommodations.
19             That letter is not including
20   information about the student's disability or
21   underlying medical condition.
22             And there's also language in that
23   letter stating that the student should speak
24   with the course instructor regarding these
25   accommodations so that the instructor can

61

1    support the implementation of the
2    accommodations.
3         And then there's also language
4    stating that if the course instructor has any
5    questions or concerns about applying these
6    accommodations in their course, they can
7    follow up with Disability Services to discuss
8    those questions or concerns.
9         And then if the student has testing
10   accommodations, faculty course instructors can
11   in some cases administer accommodated exams,
12   or they may elect to have the Weingarten
13   Center administer those exams.
14        And we work with the faculty to, you
15   know, obtain the -- each exam in a timely
16   manner provided to the student under the
17   appropriate accommodations -- conditions based
18   on their accommodations and the conditions of
19   the exam.  And then we return the completed
20   exam to the professor following their
21   instructor -- their instructions.
22        Q.   So, anything else regarding the
23   approval process?
24        A.   Well, we describe it as an
25   interactive process.  So, the disability

1  specialist may have additional questions upon
2  receipt of, you know, documentation.  They
3  may reach out to the student with those
4  questions.
5        In some cases they will seek the
6  student's permission to communicate with a
7  medical provider, if necessary, for
8  clarification.  Or they may -- it -- it may
9  be determined that the documentation is
10 insufficient in supporting certain
11 accommodations.
12       In that case, the accommodation may
13 not be denied.  But the stud- -- the -- the
14 disability specialist may reach out to the
15 student and say additional documentation is
16 needed and -- and answer any questions the
17 student may have about that process.
18             (Audio muted.)
19       THE WITNESS:  We can't hear you now.
20       MS. GREENSPAN:  Sorry.  You were
21 muted for most of that question.  Can you
22 repeat that, please?
23 BY MR. HARRIS:
24    Q.  What is the process if an
25 accommodation is denied?

79

1  roster process is not about kind of
2  reapproving accommodation.  It's just working
3  with the -- it's the student working with the
4  disability specialist to determine which
5  courses to apply their accommodations.
6           Some students don't, you know, have
7  -- you know, like our -- some students, you
8  know, obviously -- it's -- they self-identify.
9  So that means it's always up to a student
10 to -- you know, if they want to work with the
11 disability -- with Disability Services, you
12 know, and identify as a student with a
13 disability.
14          But if a student moves through the
15 accommodation approval process, it remains up
16 to the student if they want to use those
17 accommodations.
18          Because, you know, an implicit aspect
19 of that process is that if a student wants to
20 apply accommodation to a -- accommodation to a
21 specific course, then that instructor needs to
22 be notified of those accommodations.
23          And for many different reasons the
24 student may not want to identify -- you know,
25 to apply accommodations to a specific course,

80

1   may not want a professor to be aware of those
2   accommodations.  So that's up to that -- that
3   student.
4       Q.   So when a student gets -- let's take
5   the test-taking accommodation example.
6       A.   Okay.
7       Q.   In semester one, the student goes to
8   Disability Services, goes through the process,
9   the collaborative interview, the decision
10  tree, et cetera, SDS approves a test-taking
11  accommodation in the first semester.  Then in
12  the second semester, obviously, the student's
13  going to be in some obviously different
14  classes, and the student doesn't need any of
15  the accommodations in the second semester, so
16  there's no interaction with SDS.
17      A.   Yes.
18      Q.   The third semester comes along and
19  the student wants to accommodate class one and
20  three out of five classes.
21           Does the student at that point have
22  to physically come back to Disabilities
23  Services to activate the accommodations for
24  class one and three?
25           MS. GREENSPAN:  I'm just going to

81

1   place an objection to the form.
2           But you can answer.
3           THE WITNESS: So, during the -- from
4   2015 to 2020, the -- the process was that
5   students would come into the Weingarten Center
6   in person to complete that course roster in
7   the process and have a conversation with the
8   disability specialist.
9           So, again, they're not reapproving
10  their accommodation. But the student is
11  notifying Disability Services if they -- you
12  know, which courses they want to apply their
13  accommodations to. So that was an in-person
14  meeting.
15  BY MR. HARRIS:
16      Q.  That being an in-person meeting, was
17  that something specifically required, or was
18  that just sort of how things happened?
19      A.  I believe that was -- I would
20  describe it as a practice of Student
21  Disability Services, the idea being that they
22  wanted to -- you know, the disability
23  specialist, in addition to kind of completing
24  this procedure to -- you know, with the
25  semester request or course rostering, would

1  also be able to have a conversation with the
2  student to see how their academic progress is
3  going, if they have encountered any new
4  challenges since they last spoke with a
5  disability specialist, and to see if any
6  additional support could be provided.
7        Q.   And so to the -- so when you say "a
8  practice," in some areas of the law that has,
9  like, a specific legal meaning.
10            So could you tell us what you mean
11  when you say that it was a practice of the
12  office?
13       A.   Yeah.  I guess I mean that I don't --
14  I don't know that it was written down as a
15  requirement, which I would think of as like a
16  policy, but that it was a way of administering
17  the business of -- you know, administering the
18  process that was followed by Disability
19  Services.
20       Q.   To that end, were disability
21  specialists permitted to conduct this
22  follow-up interview by phone?
23       A.   I -- I don't know if -- if they would
24  conduct that process by phone.
25       Q.   And just to be super clear, is it

194

1 those documents and giving some of that
2 testimony here today?
3    A.   Yes.
4    Q.   And what she -- in that instance, in
5 2008, did Mr. Ploeger follow the process set
6 forth by SDS for requesting accommodations?
7    A.   To my knowledge, she did.  And since
8 the documentation reflects that she submitted
9 documentation related to her disability, she
10 had an initial meeting with Disability
11 Services staff.
12         And from what I could see, she was
13 approved for accommodations related to testing
14 and -- yeah.  So, yes.
15    Q.   Did she get those accommodations?
16    A.   As far as I can tell from the
17 documentation, she did.
18    Q.   Now, fast forward to some of the
19 documents and testimony from today about 2016.
20         When Ms. Ploeger refused to meet with
21 SDS without a lawyer or legal advocate
22 present, what happens to the interactive
23 process at that point?
24    A.   So, the interactive process requires
25 interaction between Disability Services and

195

1  the student through meeting either to discuss
2  new documentation that's been submitted or the
3  current impact of underlying condition or
4  disability on the student's current semester
5  or their ability to access campus facilities.
6  And when this meeting doesn't occur, the
7  process cannot continue.
8        MS. GREENSPAN: Okay. Thank you. I
9  don't have any further questions right now.
10       MR. HARRIS: I have some follow-ups
11 based on that.
12              E X A M I N A T I O N
13 BY MR. HARRIS:
14   Q.  You said you reasonably did what you
15 could to prepare for today's deposition.
16       What does the word "reasonably" mean
17 to you?
18   A.  To me, it means based on the
19 documentation that is available to me, in
20 addition to any documentation that I could
21 obtain, and my knowledge of the context of
22 that documentation, and making sure that I
23 familiarized myself fully with those
24 materials to be able to speak about them
25 knowledgeably.

200

1   said that the understanding that somebody
2   couldn't have a lawyer at SDS was based on the
3   training that you received under Academic
4   Integrity and Code of Student Conduct,
5   correct?
6       A.   And also my interpretation that the
7   accommodation approval process is not a legal
8   process.  And if Disability Services has to
9   engage in a legal process, they would refer
10  that to the Office of General Counsel.
11      Q.   Did anybody say, "Hey, Office of
12  General Counsel, April wants to have a lawyer
13  at her disability meeting"?
14      A.   You're asking about a question
15  someone may have asked in 2016?
16      Q.   Yes.
17           MS. GREENSPAN:  I'm going to object
18  based on privilege.
19           But if you can answer, go ahead.
20           THE WITNESS:  Yeah, I don't -- I'm
21  not able to answer that question.
22  BY MR. HARRIS:
23      Q.   So, to be clear, if somebody wants
24  to bring a lawyer to their SDS meeting, SDS
25  would at that point reach out to General