# EXHIBIT 65

```
1                IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2                      PHILADELPHIA DIVISION

3

4    APRIL PLOEGER,                    )
                                       )Case No: 2:22-CV-02389JHS
5              Plaintiff,              )
                                       )
6            v.                        )
                                       )
7    TRUSTEES OF THE                   )
     UNIVERSITY OF PENNSYLVANIA        )
8                                      )
               Defendant.             )
9

10

11                          - - -

12              DEPOSITION OF DR. SUSAN SHAPIRO

13                          - - -

14                      May 22, 2025

15

16

17

18

19

20                      Reported by:

21              Jeanne L. Manko
                  Court Reporter
22              1424 Roosevelt Road
                Pittsburgh, PA 15237
23                 412.969.4506
                jeanne@strideaway.net
24
```

```
 1    was a question, we worked directly with general -- or

 2    counsel's office to clarify or get understanding --

 3    BY MR. HARRIS:

 4         Q.    Okay.

 5         A.    -- to make sure we were following the law.

 6         Q.    So if a question arises then you would check

 7    up on that question?

 8         A.    (Witness indicates to the affirmative.)

 9         Q.    Is that a "yes"?

10         A.    Yes.  Absolutely.  If there were any

11    questions.

12         Q.    Another one of the duties you said was to

13    meet with the students and review documentation.

14               What documentation were you reviewing?

15         A.    The documentation submitted by the students.

16         Q.    What document is submitted by the students?

17         A.    That depends on their specific disability

18    and whether it's a medical or psychological learning.

19    It really depended on the documentation -- the

20    particular presenting request for accommodation.

21         Q.    And what is the goal in reviewing whatever

22    the documentation is for a particular student?

23         A.    It's one part of the process that we use to

24    understand if there a disability, the impact of the
```

1    disability on students' -- how they were limited in

2    major life functions.

3         Q.    Now, I've learned that the non-medical

4    doctor is a much larger contingent at the academic

5    population throughout this case than I was previously

6    aware of.

7              Are you a medical doctor or a PhD doctor?

8         A.    A PhD doctor.

9         Q.    Did SDS have any medical doctors on staff?

10        A.    It did not.

11        Q.    Okay.  And correct me if I'm wrong, but

12   would the documents that the office is reviewing, would

13   those be medical documents?

14        A.    It may be.

15        Q.    Okay.  And was there any training and

16   interpretation of medical documents?

17        A.    If there were questions, with permission, we

18   consulted with Student Account Services physicians.  We

19   may consult with the student's doctor, obviously with

20   his or her written permission.

21        Q.    And when meeting with the students, you're

22   talking about the student that needs a particular

23   accommodation?

24        A.    Uh-huh.

1          Q.    And if you could just say "yes" or "no."

2          A.    Yes.  Yes.  I'm sorry.

3          Q.    No worries.  That's how regular people talk.

4     These lawyers.  Ugh.  Okay.

5                Can you walk us through the meeting that

6     would occur with the student?

7          A.    When a student comes in, we want to learn

8     about their request for accommodations.  We request

9     documentation of their -- about their condition.  When

10    we meet, it's a collaborative interactive process where

11    we really want to get to know the student, what their

12    needs are, what they're asking for, their concerns so

13    that we can most appropriately accommodate them.

14                If we have questions about the

15    documentation, we get releases so that we can

16    communicate, either with their professionals or the

17    professionals at Student Account Services.

18         Q.    Okay.  All of those definitely make sense to

19    me as to goals of the meeting.

20                Do these meetings have an itinerary?

21         A.    It's not a formal process because we're

22    dealing with humans and everybody's different.  But our

23    goal is to understand what the student is asking for,

24    what their needs are.

1    participate in the collaborative process.

2         Q.    What document?  You said you asked for

3    documents.  What documents were those?

4         A.    I asked for -- requested documentation of

5    her disability services so that we could review that as

6    part of the process for determining accommodations.

7         Q.    And then in terms of the collaborative

8    process, for April, specifically in the Spring of 2016,

9    what was the sort of outline of the plan for that

10    specific collaborative process?

11         A.    I asked several times to meet April because

12    that's really a crucial part in our being able to

13    determine accommodations is to be able to speak with the

14    student, see what the accommodations are that the

15    student's requesting, understanding the impact of her

16    disability, her perspective, and really to understand

17    her and be able to make appropriate decisions in going

18    to provide her with access.

19         Q.    And the accommodations that were requested,

20    that was like extra time to take tests?  Was that it?

21         A.    I think there were other requests for

22    accommodations.

23         Q.    Were there other requests related to test

24    taking?

1       A.    She wanted to come with an advocate or a

2   lawyer.

3       Q.    Oh.  So why couldn't she?

4           MS. GREENSPAN:  Objection.  Asked and

5   answered. You may answer again.

6           THE WITNESS:  You want me to answer?

7           MS. GREENSPAN:  You can answer again.

8           THE WITNESS:  Okay.  It's not in our

9   practice.

10  BY MR. HARRIS:

11      Q.    Is there anywhere that this practice of not

12  allowing lawyers adopted?

13      A.    This is a process.  If a lawyer is involved,

14  it becomes a legal process and -- and our legal counsel

15  has to be involved in that process.  But that's not how

16  we practice.  Our practice is to determine

17  accommodations.  It's not a legal process.  A legal

18  process happens later, if there is a concern.

19      Q.    Right.  Is there any documentation that

20  would reflect this practice?

21      A.    Not to my knowledge.

22      Q.    Isn't it true that Ms. Ploeger asked for --

23  certainly her attorney, but she also asked for an

24  advocate, right?

```
1    allowed to meet with her lawyer, advocate, or witness?

2         A.   Yes.

3         Q.   Who did you ask?

4         A.   Brenda.

5         Q.   Did Brenda respond to you?

6         A.   Yes.

7         Q.   When did you ask Brenda?

8         A.   I don't remember.

9         Q.   Do you remember whether it was before or

10   after February 10th, 2016?

11        A.   It was probably before because there were

12   other e-mails in which the issue of April having a

13   lawyer -- where she stated she wanted a lawyer.  As far

14   as I can remember, there were several.

15        Q.   Why wouldn't you meet -- or have this

16   meeting with April over e-mail?

17        A.   Over e-mail?

18        Q.   Yeah.

19        A.   Our practice was to meet with students.

20   It's the humanistic process to meet and get to know a

21   student.  And a lot is missed through an e-mail.  A lot

22   is misinterpreted.  Our practice was to meet with

23   students.

24        Q.   Sure.  You had been meeting with April at
```

1          THE WITNESS:  As I said before, if somebody

2     needs information about a particular case, they receive

3     the notes, the copy of those notes, as well as any

4     documents that were in the file.

5          Q.   Now, we had seen, I believe what you said,

6     in the third tab, the approved accommodations, meaning

7     extended test-taking time, alternative test location,

8     et cetera.

9          Why did you need to meet April again about

10    those same accommodations?

11          MS. GREENSPAN:  Object to the form.  You may

12    answer.

13          THE WITNESS:  Okay.  April was asking for

14    additional accommodations and we needed updated

15    documentation.  That was way before this particular

16    time.  And --

17    BY MR. HARRIS:

18          Q.   Does -- oh, I'm sorry.  I didn't know you

19    were done.  I apologize.  I didn't know you weren't

20    done.  I apologize.

21          A.   And the nature of her condition had changed.

22    She indi --

23          Q.   I'm sorry.  I thought you were done again.

24          A.   Yeah.  No.  No, I'm done.

```
 1              MS. GREENSPAN:  Can you finish your
 2      sentence, please.
 3              THE WITNESS:  Because she had indicated
 4      there were other accommodations she wanted and that she
 5      had some conditions, which I don't clearly understand
 6      because there wasn't the kind of documentation we needed
 7      to understand those.
 8      BY MR. HARRIS:
 9         Q.    And so let's break that down.  So there's
10      the prior accommodations that she already had approved
11      that she was requesting and then there's a different
12      additional set of accommodations that she was requesting
13      as well; is that correct?
14         A.    Yes.  And we always -- when there is a
15      medical condition, nature can change and so we updated
16      documentation.  And clearly in this case it's indicative
17      that we need updated documentation to know how to
18      accommodate current conditions.
19         Q.    And what was the nature of change in April's
20      condition?
21         A.    I don't know because we really didn't get
22      documentation.
23         Q.    How do you know there was a change?
24         A.    Because she indicated it in her e-mails.
```

```
 1    this meeting and so forth for the new accommodations,

 2    your office still refused to give her the previous

 3    accommodations.

 4              Do I have that correct?

 5         A.   Not exactly.  We needed updated

 6    documentation.  I believe that was based on much older

 7    documentation.  And we need to take a look.  We didn't

 8    refuse to give her the accommodation.  We needed updated

 9    documentation which we asked for repeatedly and did not

10    receive.

11         Q.   And the conditions that April had that

12    necessitated those previous accommodations, those were

13    chronic life-long conditions, correct?

14         A.   I don't believe so.  Well, it's going way

15    back to when she was approved for those accommodations.

16    And I don't have the records in front of me to look.

17         Q.   So looking at the accommodations, we are

18    talking about January 16, 2015?

19         A.   No.

20         Q.   No?  That's not what that date is?

21         A.   I don't know what this form is.  I don't

22    know what this form is.  They were her initially

23    approved accommodations.  Transportation is based upon a

24    condition, of which I believe we didn't have current
```