# EXHIBIT 66

1                 IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2                       PHILADELPHIA DIVISION

3

4    APRIL PLOEGER,                    )
                                       )Case No: 2:22-CV-02389JHS
5                 Plaintiff,           )
                                       )
6              v.                      )
                                       )
7    TRUSTEES OF THE                   )
     UNIVERSITY OF PENNSYLVANIA        )
8                                      )
                  Defendant.           )
9

10

11                            - - -

12               DEPOSITION OF ELAINE VERAS

13                            - - -

14                      April 14, 2025

15

16

17

18

19

20                      Reported by:

21                   Jeanne L. Manko
22                    Court Reporter
                   1424 Roosevelt Road
23                 Pittsburgh, PA 15237
                     412.969.4506
24                 jeanne@strideaway.net

1    documents that you've received and I reviewed.

2         Q.   Was the $10 a month only written in the

3    context of e-mails or was there like a formal document

4    that was, you know, signed, agreed to, et cetera?

5         A.   The document was in an e-mail confirming a

6    conversation that had been had with April with the

7    ability for her to respond and indicate that that was

8    not correct.

9         Q.   The $10-a-month payment conversation, was

10   that the only conversation that the school had regarding

11   reviewing April's case and determining what was in her

12   best interest?

13        A.   Absolutely not.

14        Q.   Okay.  Can you tell us about the other ones,

15   please?

16        A.   April received multiple notifications from

17   Michelle Brown-Nevers.  She received multiple

18   notifications from Joe Delaney.  She received a

19   notification from Matt Sessa.  She received information

20   from Heather Hunsberger.

21             All of them were notifications regarding her

22   account, regarding what she owed, and regarding her

23   responsibility.  In each one of those cases, April

24   responded, requesting continued clarification on the

1    trustee scholarship which had been answered several

2    times the same way.

3            There were no surprises for April in terms

4    of what she owed and when she owed and how much she

5    owed.  But in each case, we tried to review with her.

6    We tried to make negotiations with her.  We tried to

7    allow her to continue to finish her education while

8    working on these financial problems.

9            Many times she went on a leave and she came

10   back.  Strategically she went on a leave shortly after

11   the Add/Drop period which allowed her to receive her

12   federal funding and then leave.

13           So that means that she received refunds for

14   funding that she was not eligible for.  And that was a

15   continual pattern for five of the years that she came

16   and she withdraw and then came back.  And you'll see

17   that when you look at her transcript that explains when

18   she came, when she went on a leave, and then when she

19   came back.

20       Q.   When you say left after Add/Drop, what does

21   "Add/Drop" mean?

22       A.   The University, as do all universities, has

23   a policy for allowing students to add courses to their

24   semester and then drop courses from their semester,

```
1    account," that's the account that I referred to earlier

2    that talks about tuition, fees, all the charges, and

3    then all the funding that she received that were applied

4    to that account.

5              So when she was put on a collection hold, it

6    has to do very specifically with the student account.

7    But she also owed on the student aid loan that she

8    received through the University.

9         Q.   Prior to the Spring of 2016 collection hold,

10   was Ms. Ploeger placed on a registration hold?

11        A.   Not that I've seen in any of the documents

12   I've reviewed.  Keep in mind she was also on a leave

13   prior to that for an extended period of time.

14        Q.   Was the Spring 2016 collection hold ever

15   lifted?

16        A.   Yes.

17        Q.   When was that lifted?

18        A.   The following term.

19        Q.   Why was it lifted the following term?

20        A.   Because she had a conversation with the

21   school representatives, with the Financial Aid Office.

22   As I've shared with you, we do a review.  She explained

23   that she had every intention of making good on those

24   payments and we wanted to work with her.
```

1                    So, we said, we will lift the collection

2       hold but we do need you to make the following payment.

3       I believe it was a $500 payment.  And we can move

4       forward.

5                    We allowed her to move forward but we never

6       received that payment.

7            Q.    Are there any documents that reflect the

8       agreement for a $500 payment for her to move forward?

9            A.    Yes.  There was an e-mail sent confirming

10      the conversation that we had with her and the agreement

11      we had of allowing her to continue.

12           Q.    Was Ms. Ploeger put on a subsequent

13      collection hold?

14           A.    She was not.

15           Q.    Ever?

16           A.    Correct.

17           Q.    Was Ms. Ploeger put on a subsequent

18      registration hold?

19           A.    She was not.

20           Q.    How much money does April owe the school

21      now?

22           A.    Again, I would refer to the memo that

23      Matt Sessa sent in 2018 which totaled her student aid

24      loan amount, which was approximately $12,000 at that

1    still owes both in the student aid loan and on the

2    student account.

3              And, again, there would have to be an

4    extensive conversation with the school to determine if

5    they were allowing her to return and whether we, as a

6    financial institution, will allow her to return, and

7    would the expectation be at this point that she pay the

8    full balance on both accounts.

9              So it's another one of those it-depends.

10        Q.    So before -- if I understand you correctly,

11   for April to return from the withdrawal, the school

12   would have to do its process to address the return, you

13   know, does she need to start over or do classes expire,

14   stuff like that; is that correct?

15        A.    That is correct.

16        Q.    Okay.  Then the other side of that is

17   there's a loan balance and whether or not the office

18   would allow her to return, and the expectation is that

19   she would have to pay off that full balance; is that

20   correct?

21        A.    At this point in time, that would be the

22   expectation.

23        Q.    How long has April paying off the whole

24   balance been the expectation for her return?

1          A.     Since 2009.

2          Q.     If that's been the expectation since 2009,

3     how has she come back without paying the whole balance?

4          A.     And that's exactly my point.  We have

5     allowed her to come back without having to pay that

6     balance.  We have allowed her to continue on with her

7     education without paying that balance.  But what we've

8     asked of her is to make some reasonable payments, which

9     is why the $10 came into effect.

10         What we've asked of her is to show us where

11    this funding would come from to pay the balance.  But

12    what she would do is she would register, she would get

13    her financial aid and then she would withdraw.  So

14    instead of paying the balance, she would take the

15    refund.

16         Q.     And so when did Penn's position change of

17    we're not letting her come back until she pays the full

18    balance?

19         A.     That wasn't Penn's position.  Remember, when

20    she left in 2009, we readmitted her in 2012, but then

21    she chose to withdraw this time in 2018.

22         That's different than going on a leave.  All

23    of those other periods of time she requested a leave,

24    she went on a leave.  This final period on 2018, she did

1    not request a leave; she actually chose to withdraw.

2         Q.    And so I guess my -- then a little bit of my

3    confusion, then, is, you know, at this juncture Penn's

4    position is April can't come back until she pays off the

5    full balance.  And then you said that that has been the

6    expectation since 2009, but she was allowed to come back

7    subsequent to 2009.

8         So my question is trying to figure out

9    between 2009 and now, when did Penn decide, okay, before

10    April can come back, she has to pay the whole balance.

11         A.    Well, remember, the first piece of that is

12    will Penn allow her to return from a withdrawal.  Most

13    students who withdraw have to reapply to the program all

14    over again.  And since the 2018 was seven years ago, I'm

15    sure, and I can't speak for it on the academic side, but

16    I would suspect that there is a change in curriculum

17    which would require her to reapply.

18         That's going to have to be the first piece

19    of this.  And then after that, we would most likely go

20    back and reevaluate, just like we always have, to

21    determine whether she's going to have to pay all of that

22    balance, come up with an agreement, or not.

23         But I will say that after five years of

24    repeated pattern, we would have to indicate something in

```
 1    regards to that pattern occurring again.
 2         Q.   Now, did April, at any point between 2018
 3    and now, attempt to return to the University?
 4         A.   Not that I'm aware of, no.
 5              MS. GREENSPAN:  Objection to scope.
 6    BY MR. HARRIS:
 7         Q.   Is there currently a collections or
 8    registration hold on April's account?
 9         A.   There is currently a collection hold on her
10    account.
11         Q.   How long has the collection hold been on her
12    account?
13         A.   The collection hold ultimately moves to a
14    collections.  Ultimately there is no hold anymore
15    because she is withdrawn, so there's no opportunity for
16    her to reregister.  So it's strictly with collections,
17    and at that point it's with a third-party vendor who is
18    solely responsible for the collection of the balances,
19    of both the student loan as well as the outstanding
20    balance on her student account.
21         Q.   When did that go to collections?
22         A.   I'm not sure.  I would have to check on
23    that.  But since she's owed this for seven years now, I
24    would say at least the last five years.  And she would
```

1          Q.    When is the first time that April had a

2    student aid loan?

3          A.    The first time was in 2016.

4          Q.    And when was the second time she got a

5    student aid loan?

6          A.    The second time was in 2014.  Oh.  Sorry.

7          Q.    We're going backwards.

8          A.    Go back.  The first time was in 2012 and the

9    second time was in 2014.  Sorry.

10         Q.    Okay.  Got you.  So what do you mean by

11    independent student?

12         A.    April had some family concerns that allowed

13    us to treat her -- give her special treatment with

14    documentation so that she could become an independent

15    student.  And we did that through following federal

16    regulations regarding unusual family circumstances.

17         Q.    What does independent student mean?

18         A.    It means we're no longer going to be

19    requiring any parental information.  For the college

20    board profile that I talked to you about where we get

21    the expected family contribution, we always require an

22    undergraduate dependent student to provide their

23    parental information as well as theirs.  In her case, we

24    did not.

1      Q.    What about being an independent student

2   makes it difficult to be eligible for federal loans?

3      A.    There's very limited funding available for

4   an undergraduate independent student on the federal

5   side.  And the loan that is available has a credit check

6   and her credit was not great and, therefore, she was

7   denied the loan.

8      Q.    Did April have an expected family

9   contribution?

10      A.    She had a very minimal expected family

11   contribution.

12      Q.    Now, if I understand the Trustee Scholarship

13   correctly, the cost of attendance minus the expected

14   family contribution equals her amount of the

15   scholarship; is that correct?

16      A.    Equals her eligibility.  So, yes.

17      Q.    Okay.  Did April's expected family

18   contribution ever change?

19      A.    It did not.

20      Q.    And so under your Penn Grant program, then

21   it would be the cost of attendance minus her expected

22   family contribution, equals her amount of the Penn Grant

23   Program?

24            Is that how that works?

1      A.    That's correct.  And in April's case, very

2    specifically, her expected family contribution was $100.

3    So she was a very needy student.  She had no income,

4    which would be what you would expect for a student, and

5    she was receiving over $80,000 in grant funding.

6      Q.    And we used the term a couple times, "cost

7    of attendance."  What does that encompass?

8      A.    Cost of attendance includes tuition, fees,

9    health insurance, housing, on-campus housing, dining.

10   Those are the charges.  Then beyond the charges, we also

11   allow for a personal allowance in cost of attendance and

12   a transportation allowance in cost of attendance.

13          Those are not charges directly but they are

14   dollar amounts that we do allow in the cost of

15   attendance in case a student needs to take -- well,

16   nowadays there are Ubers -- but in a case where a

17   student has to take public transportation or if they

18   needed to go to CVS to get a hair dryer, we are required

19   to allow those components.  And those components are

20   dictated to us by the creation of a cost of attendance

21   in the federal regulations.

22     Q.    When April took the 2012 loan, how much was

23   that for?

24     A.    The 2012 loan was for $8,000.  And she

1    borrowed that based on medical expenses that she had.

2    And we are allowed, by federal regulations, to increase

3    our standard cost of attendance by very minimal

4    exceptions, and one is medical expenses.  And that's

5    medical expenses that are not already covered by

6    insurance.

7              So we would get an explanation of benefits

8    to validate whatever medical expenses a student had.

9    That was required.  We are also allowed to increase a

10   cost of attendance dependent care.  So if we had a

11   student who was a parent and they had childcare costs,

12   we are allowed to increase the cost of attendance for

13   that.

14             In April's case she had medical expenses

15   that were not covered by insurance.  When she shared

16   with us the documentation minus any of the diagnosis,

17   because in Financial Aid we're not allowed to see any of

18   that, then we were able to increase her cost of

19   attendance and get her a student aid loan to cover that.

20        Q.   It sounds like the cost of attendance -- not

21   everybody got an extra $8,000 in cost of attendance.

22             That's a case-by-case basis?

23        A.   Correct.

24        Q.   And then how much was the loan for in 2014?

```
1   because CAPS doesn't require us to pay them, nor does

2   Disadvantage Services require students to pay them

3   directly.  Those are services that are provided to the

4   student.

5           Q.    Was the 2012 loan repaid?

6           A.    Yes, it was.

7           Q.    And the 2014 loan, was that repaid?

8           A.    No, it was not.

9           Q.    Has any of the 2014 loan been repaid?

10          A.    No, it has not.

11          Q.    When was the 2014 loan first -- when did it

12  first become due?

13          A.    It became due when she went on her next

14  leave.  So, do you remember when -- her sequence was

15  over 2012/2013, she went on a leave in February.  She

16  got the funding at the beginning of February.  She did

17  not return until the Fall of the next academic year, at

18  which point she was told -- she borrowed that loan, she

19  wasn't eligible for that loan, she needed to return that

20  loan.  So with the money that she got as a refund, she

21  paid the loan back.

22          Q.    What made her not eligible for the loan?

23          A.    She left in February of the term that

24  started and, therefore, was not eligible for the
```

1      A.    Correct.    Yes.

2      Q.    When she says that the work-study reduction

3  did not come until after she argued for weeks with the

4  office, have you seen anything that indicated that the

5  work-study reduction happened immediately as opposed to

6  after an argument?

7      A.    What I did see was back in 2014 when she

8  started getting the outside scholarship, a request to

9  Michelle Brown-Nevers, similar to this, asking how the

10  outside scholarship was supposed to be treated.  And

11  Mitchell has a full e-mail response to her explaining

12  how the outside scholarship works and that this is what

13  we will do going forward, at which point April said,

14  "Thank you.  I really appreciate that."

15      Q.    Okay.

16      A.    So we resolved -- I should say the group

17  resolved this question back when she first started

18  getting her outside scholarship.  So what continues to

19  be confusing to me is she brings up the same questions

20  every single year and says she hadn't gotten an answer.

21  But, in fact, we have provided answers and we've

22  provided lengthy answers to her.  So that's confusing to

23  me why she would keep asking something that she already

24  got an answer to.

1        Q.    Oh.   (laughing) It says, "Hi, Ms. Delaney

2    and Ms. Shanks.   I've said this numerous times, but

3    nobody has gotten back with me in regards to an answer,

4    and if I don't get an answer or decision soon, my

5    attorney will have to take over from here.   I am on

6    leave because of an issue caused by Penn and therefore I

7    feel I    should" -- and I stupidly put the sticker over

8    that -- but it says either should or should not have to

9    make payments during this time.   "Can you all make this

10   happen?   I've CCed other relevant people here because

11   this either needs to happen or I need a good reason why

12   it can't happen.   I've e-mailed everyone several times

13   with this question and I am not getting assistance.   I

14   need help."

15            Did I read that correctly?

16       A.    Yes.

17       Q.    Okay.  Did you ever respond to this e-mail?

18       A.    No, I did not.

19       Q.    To your knowledge did anyone ever respond to

20   this e-mail?

21       A.    It's 2017.  Matt responded in 2018, but I'd

22   go back a little bit to say that this infers that she's

23   not able to make payments and that this is somehow new,

24   but this is going back to payments that were due

1    starting in 2006.

2             So this was a repeat of she's notified that

3    she has a balance, she's notified that she has late

4    payment penalties, and it gets carried forward and

5    continues to get carried forward.  And so now we're in

6    June of 2017, which is the end of Spring of 2017, and

7    she's collected all of these balances and continued to

8    let us know that she's not able to make payments.  And

9    we continue to try to work with her.  We've tried.

10   We've tried reducing late fees and collection fees.

11            So I'm just, I guess, a little confused as

12   to her constant repetitive "I'm not getting any help"

13   when we -- throughout the years, you can see we've given

14   quite a bit of help to help support her.  And we hadn't

15   stopped.

16       Q.   So to that end, do you know why there's no

17   clarification given to April about this issue?

18            MS. GREENSPAN:  Object to the form.

19            THE WITNESS:  One of the clarifications that

20   I'm talking about was the 2018 memo from Matt, which was

21   shortly after this.

22   BY MR. HARRIS:

23       Q.   Well, when you say "shortly after this," you

24   are saying shortly after June 8th of 2017?

1      A.    I believe April's referring to the student

2  aid loan.  From reviewing her loan history, the only

3  loan she had during her education was a student aid

4  loan.

5      Q.    Okay.  And do you know whether that was put

6  into deferment?

7      A.    It was not put in deferment after she did

8  not make payments.  In Matt Sessa's memo, he explains

9  that her loan was put into forbearance twice.  The

10  forbearance allowed for her to not make payments for

11  almost eight months so that she could collect herself

12  and she could do what she needed to do.

13          However, since she didn't make payments

14  after it came out of forbearance, the deferment process

15  was no longer available to her and that she now needed

16  to make payments towards the loan.

17      Q.    And are those requirements detailed

18  anywhere?

19      A.    They are detailed in the promissory note.

20      Q.    Okay.  April writes on May 24, 2017 that she

21  can't afford to pay and that "In the past all of my

22  student debt was held by the school or whatever, and I

23  was never charged.  Now, for some reason, just like the

24  promises I received from SFS and the Trustee Scholarship

1          A.    Yes.

2          Q.    Have you discussed your testimony during the

3     break?

4          A.    No.

5          Q.    Okay.  So what I want to do is just quickly

6     go over a couple of exhibits.  This will be Exhibit 169.

7     We are looking at Exhibit 169, Bates No. 1018 through

8     1021.

9               Is this one of the documents that you

10    reviewed in preparation for the deposition?

11         A.    Yes.

12         Q.    Okay.  It appears to be from

13    Ms. Brown-Nevers to April with numerous people copied on

14    it.  It says, "Dear April, I am in receipt of the e-mail

15    messages you recently directed to me," and it goes on to

16    say, "Although you continue to assert SRFS has not

17    responded to your inquiries, there is a clear record

18    that we have responded.  However, it is not productive

19    for us to keep repeating the same thing."

20               Did I read that correctly?

21         A.    Yes.

22         Q.    Okay.  Have you seen the clear record that

23    Ms. Brown-Nevers -- Dr. Brown-Nevers is referring to on

24    July 28, 2016?

1        A.    Yes.

2        Q.    And what does that clear record consist of?

3        A.    It consists of messages from -- all part of

4    the documents that we've reviewed here, messages from

5    Jo Delaney, messages from Heather, messages from

6    Michelle Brown-Nevers addressing, similar to this, each

7    of the individual topics in answering the questions as

8    April has asked them.

9        Q.    Okay.  This is Exhibit 163.  Is this one of

10   the documents that you reviewed in preparation for your

11   deposition?

12       A.    Yes.

13       Q.    January 18, 2017's e-mail from April to

14   Ms. Hunsberger, do you know if Ms. Hunsberger replied?

15       A.    I do not know if hers was one of the replies

16   or if it was Jo Delaney's in 2017.

17       Q.    Do you know whether anybody replied to this

18   e-mail?

19       A.    Well, the answers were given to her prior.

20   After January 2017, I don't recall this being answered

21   again.

22       Q.    Okay.  Exhibit 160.  Now is this one of the

23   documents you reviewed to prepare for the deposition?

24       A.    Yes.