# EXHIBIT 67

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

APRIL PLOEGER,              :
                           :   CIVIL ACTION
          Plaintiff        :
                           :   NO. 2:22-cv-02389-JHS
          vs.              :
                           :
THE TRUSTEES OF THE        :
UNIVERSITY OF              :
PENNSYLVANIA,              :
                           :
          Defendant        :

- - -

***DEPOSITION***

DEPONENT:   DAVID WALLACE PANSING

DATE:       Friday, April 11, 2025

TIME:       10:03 a.m.

PLACE:      Zoom Videoconference

REPORTER:   Krista L. Schultz, Registered
            Professional Reporter and
            Notary Public

KAPLAN, LEAMAN & WOLFE
230 South Broad Street, Suite 602
Philadelphia, PA  19102
215-922-7112
www.klwreporters.com

David Wallace Pansing 4/11/2025

Page 76

1    communicated to him.  I asked if your communication

2    was any different.  That's a yes-no question.  That

3    doesn't tell me the substance of your communication.

4                    ATTORNEY GREENSPAN:  I disagree.

5                    ATTORNEY HARRIS:  I mean, it clearly

6    doesn't tell me the substance of your communication.

7    That is a yes-no question.

8                    ATTORNEY GREENSPAN:  If you can answer,

9    you may answer.

10                    THE WITNESS:  No, I was told the same

11    things.  It was consistent, what I was told, across

12    those meetings.

13   BY ATTORNEY HARRIS:

14       Q.    Before yesterday did you believe that you were

15   fully ready to testify?

16       A.    Yes.

17       Q.    Since yesterday and before the deposition

18   started this morning, do you feel more prepared to

19   testify than you felt the day before yesterday?

20       A.    That's a tongue twister.  So before yesterday,

21   so you're saying --

22       Q.    Let me say it like this:  As of Tuesday, did

23   you feel you were fully ready to testify for this

24   deposition?

25       A.    Yes.

David Wallace Pansing 4/11/2025

Page 77

1      Q.    Between Tuesday and 10:00 a.m. this morning,
2  did your confidence about your own readiness increase at
3  all?
4      A.    No, it's the same.
5      Q.    Okay.  When did you learn that you were going
6  to have a meeting with lawyers yesterday?
7      A.    That meeting was set up two, three weeks ago.
8      Q.    How long did you meet with the attorneys this
9  morning?
10     A.    30 minutes.
11     Q.    How long did you meet with the attorneys
12 yesterday?
13     A.    30 minutes.
14     Q.    Let's head down to topic number 24.  Please
15 tell us everything you did to get ready to testify about
16 topic number 24.
17     A.    I reviewed the document.  But without being
18 reminded what the document is, that's all I can say.
19     Q.    And then when we pull that up, if you remember
20 anything else just let us know.  Okay?
21     A.    Thanks.  Sure.
22     Q.    Topic number 25, please tell us everything you
23 did to get ready to testify about topic number 25.
24     A.    So I'm well-versed in the return-from-leave
25 process, the return from leave and all of those things

Page 78

1  already.  I coordinated the return-from-leave process

2  for ten years for the College, so I know those.

3      Q.   That makes sense.

4           So it sounds like, and correct me if I'm

5  wrong, but for topic number 25 you were able essentially

6  just to talk about that stuff cold, didn't have to read

7  any extra documents or talk to any extra people?

8      A.   Correct.

9      Q.   Okay.  Got you.

10          And then topic number 26, can you tell us

11  everything that you did to get ready to testify about

12  topic number 26.

13     A.   I read the document.

14     Q.   Did you have to talk to anybody?

15     A.   No.  I could tell from the document what the

16  answer was.

17     Q.   And then, finally, topic number 32,

18  understanding, of course, that not all of these numbers

19  apply to you, what did you do to get ready for topic

20  number 32?

21     A.   I reviewed the documents and -- that applied

22  to me and associated that with the other information

23  that I had been reviewing in notes and other things,

24  looking through how they fit into the record, I guess.

25  Not knowing what questions would be asked in advance, I

David Wallace Pansing 4/11/2025

Page 79

1    just familiarized myself with the documents and what was

2    going on in those cases.

3                    ATTORNEY HARRIS:  It seems like it's a

4    good time for another break.  I'll leave it up to the

5    court reporter and then the witness as to whether you

6    want to take a classic lunch break or if you just want

7    to do more of an extended comfort break of maybe

8    20 minutes.

9                    ATTORNEY GREENSPAN:  Would you like to

10   take lunch now?

11                   THE WITNESS:  I think I need to eat

12   something.

13                   ATTORNEY GREENSPAN:  Okay.  It sounds like

14   it's, right, time for lunch.  So how long would you

15   like?  We can take as long or as short of a break.

16   20, 30 minutes, what works for you?

17                   THE WITNESS:  Let's do 30, so we can get a

18   sandwich.

19                   ATTORNEY HARRIS:  Okay.  Sounds good.

20   We'll do -- it's 12:26.  Let's just come back at

21   1 o'clock.

22                   ATTORNEY GREENSPAN:  Okay.  See you then.

23                   THE WITNESS:  Thank you.

24            (Lunch recess, 12:26 p.m. to 1:00 p.m.)

25   BY ATTORNEY HARRIS:

David Wallace Pansing 4/11/2025

Page 80

```
 1       Q.    Are you ready to proceed with questions?
 2       A.    Yes.
 3       Q.    Do you understand that you are still under
 4  oath?
 5       A.    Yes.
 6       Q.    Did you discuss your testimony during the
 7  break?
 8       A.    No.
 9       Q.    So since we took a little bit of a longer
10  break, just want to wrap up a couple of things that I
11  think that we clarified beforehand.
12             You had mentioned that you reviewed the
13  advising notes, and you had discussed that there's the
14  Path advising notes and then there's also the CaseNet
15  advising notes, and my question is related to the Path
16  advising notes.  Were those advising notes given to you
17  to review or did you go on your own and review the Path
18  advising notes?
19       A.    Went on my own and reviewed them.
20       Q.    Then as it relates to the CaseNet advising
21  notes, were those given to you to review or did you go
22  on your own and find and review those?
23       A.    I went on my own and reviewed them.
24       Q.    Were the hub messages given to you or did you
25  go on your own and find and review those notes?
```

David Wallace Pansing 4/11/2025

Page 81

1      A.    Well, I think they were given to me, but I
2  reviewed them on the system.  So I looked at my -- I
3  looked at the system myself.
4      Q.    The leave request, slash, return forms, were
5  those given to you or did you go on your own and find
6  and review those?
7      A.    Both, I think.
8      Q.    When you say both, do you mean that they were
9  given to you and then you also went and looked at them
10  in the system or wherever it was that they were stored?
11      A.    Yeah, I found it easier to refer to them in
12  the system that I knew, so I just looked at them there,
13  but I believe they were given to me.
14      Q.    The documents that were relevant to the
15  excerpts of your portion of the deposition notice, were
16  -- when you said that, were you referring to that long
17  list of numbers in paragraph 32 as the documents that
18  were related to the excerpt?
19            ATTORNEY GREENSPAN:  Objection to the
20    form.  You can answer.
21            THE WITNESS:  Oh, I'm not sure what you're
22    asking, I guess.
23  BY ATTORNEY HARRIS:
24      Q.    Sure.  So let me put Exhibit 1 back up.
25            So we'll sort of reorient ourselves to topic

David Wallace Pansing 4/11/2025

Page 82

1    number 32, this is the one where, as you can see,

2    there's just a long string of numbers in that second

3    line of topic number 32.  And before we took the lunch

4    break you said that you reviewed documents relevant to

5    the excerpts of the notice, and my question was were you

6    referring to topic number 32, you reviewed the documents

7    that were related to you in topic number 32?

8         A.    Correct.

9         Q.    Okay.  And just wanted to confirm finally,

10   Ms. Schept is the only person you spoke with other than

11   lawyers to get ready for the deposition?

12        A.    Correct.

13        Q.    All right.  So let's see here.

14              (Pause.)

15              So this has been premarked as Exhibit 141.

16   This is Bates number D1985 through 1988.  Looking here

17   at D1988, is this one of the documents that you had

18   reviewed?

19        A.    That is.

20        Q.    All right.  And in addition to this particular

21   page, did you review the other documents that sort of

22   came with that last page there?

23        A.    Yeah.

24        Q.    I'm sorry, say again.

25        A.    Yes.

### David Wallace Pansing 4/11/2025

Page 83

```
 1       Q.     Okay.  Great.

 2              So at D19 -- this is the last page, D1988.

 3       A.     Will you show me the top page, so I know the

 4    whole series you're talking about before we get started?

 5       Q.     Absolutely.

 6       A.     Yeah.  Great.  Thank you.

 7       Q.     Absolutely.  Do you recognize this document

 8    that we premarked as Exhibit 141?

 9       A.     Yes.

10       Q.     And can you tell us generally what these

11    documents are, please?

12       A.     So Angie Estevez was one of the assistant

13    directors for academic services in our office on the

14    CaseNet team and she was coordinating with student

15    intervention services, which is a different office under

16    the vice-provost for University life that convenes a

17    meeting each semester and for the summer to discuss

18    students returning from leaves of absence or

19    separations, and she was coordinating which students we

20    would discuss at that meeting.

21              And then the document below is, I think, the

22    actual list of students and Ms. Ploeger's name appears

23    on that list.

24       Q.     Okay.  And you said that Angie is an assistant

25    director in the -- with the vice-provost from University
```

**KAPLAN LEAMAN & WOLFE**

David Wallace Pansing 4/11/2025

Page 154

1    before that they were listed on Penn in Touch, which was

2    the previous system.  So we are able to go in on the

3    student's record and see whether the hold is on there or

4    not.

5         When we get down to the deadline, we're

6    monitoring the students who have holds remaining and we

7    watch for them and we also ask advisors for each student

8    to reach out and see if that hold is going to be removed

9    or if they're in the process, what they're doing.  So we

10   try to make sure we're in communication with them and

11   finding out where they are in the process.

12       Q.   Does the committee or anyone on behalf of the

13   committee ever interact with the hold originating office

14   directly or is it just sort of looking in that system?

15       A.   So we collaborate with student financial

16   services if we can.  Especially if the student is not

17   understanding something, we try to make sure that we can

18   help the student understand or figure out what's going

19   on.  So in an informative way, informational way, we

20   would with some students contact that office and find

21   out what's going on.

22       Q.   Are there any -- so we know that there's the

23   -- I believe it was pending return, provisional return,

24   final return, those are the three possible return

25   states, correct?

## David Wallace Pansing 4/11/2025

Page 155

1    A.    Yes.

2    Q.    So let's start with the pending return.  Is

3    there anything that would -- is there any condition that

4    would prohibit the committee from pending return a

5    student?

6    A.    Is there any condition?  I don't think I

7    understand the question as stated.

8    Q.    Is there any -- whether it's a hold, whether

9    it's, you know, a certain -- I don't know, a certain

10   grade or a certain class or a certain condition where

11   the committee is not allowed to return the student on a

12   pending basis?

13   A.    So at one time if a student had incomplete

14   grades, we would not make them provisional until those

15   incompletes were done.  But we changed that, I don't

16   know, eight or nine years ago, so they could be

17   provisional until their work was done.  I think that was

18   the only one, but that one was changed at the time.

19         Yeah, I don't think that's something that -- I

20   don't think it's attached to specific conditions.

21   Q.    Okay.  And just to be clear, the question I

22   asked was about pending.  It sounds like you answered

23   about provisional.  Is your answer the same between

24   pending and provisional?

25   A.    Well, so what I said -- I don't know if it cut

**David Wallace Pansing 4/11/2025**

Page 156

1    out, what I said was that we used to only allow students

2    with incompletes to be pending, not to be provisional.

3        Q.    Got you.  Got you.

4        A.    So we've since changed that so -- yeah, so --

5    and provisional would be the same answer, though.

6    There's no specific condition that would be -- that

7    would prevent a student from being provisionally

8    returned.

9        Q.    What analysis does the committee do to decide

10    between pending and provisional?

11        A.    So I think that there's -- the committee in

12    those situations looks at what's been going on with the

13    student, are there concerns, has the student had trouble

14    returning before, are there signs that there are -- that

15    some of the issues are still ongoing.  So those things

16    might be things that they want to see some action on

17    before they make the student provisional instead of

18    making them provisional directly, then they might make

19    them pending in that case.

20        Q.    Are there any policies or guidelines that

21    inform the committee that -- or helps the committee

22    decide whether there has been a sufficient amount of

23    trouble with a student returning that necessitates a

24    pending versus a provisional?

25        A.    I don't think there's any written guidelines

David Wallace Pansing 4/11/2025

1    they are.  So we can't say any one outcome would come

2    out of that meeting.  It would be a range of outcomes --

3    -- a range suggests levels, but, you know, personalized

4    set of outcomes depending on where the student is, what

5    they need, what's going on.

6        Q.    And if I remember correctly, is there -- at

7    one of these meetings or maybe all of these meetings

8    there's the five to ten-minute discussion of the

9    particular student's situation; is that correct?

10       A.    That's correct.

11       Q.    And is that at one of these meetings in

12   particular or does that happen at all of these meetings?

13       A.    The SIS meeting?

14       Q.    The SIS meeting and the two committee meetings

15   as well.

16       A.    I'm sorry, the two what meetings?

17       Q.    The two -- the leave and return committees,

18   that little blurb, does that occur at all three of those

19   meetings or just the SIS meeting?

20       A.    Sorry, I think we're comparing apples and

21   oranges.  So tell me -- will you ask your question

22   again, because something cut out and I also don't see

23   how those things are related, so we can work it out.

24       Q.    So when the leave committee is sending a

25   student on leave, do they have that, you know, blurb of

Page 178

1      A.    Yes.

2      Q.    Since May 21st, 2018, April applied to return

3   from leave, slash, readmittance?

4      A.    Sorry was that a question?

5      Q.    Yes.

6      A.    I didn't hear the question part, then.

7      Q.    No worries.

8            Since May 21st, 2018, did April seek

9   readmittance or returning from leave?

10     A.    Yes.

11     Q.    When did she seek readmittance or returning

12  from leave after May 21st, 2018?

13     A.    I have a July 2018 request, May -- let's see,

14  a July 2021 request and a July 2022 request.

15     Q.    The requests that you have for July '18,

16  July '21, July '22, what date did Penn receive those

17  requests?

18     A.    I don't have the exact date written down.  I

19  assume they're on the documents.  July, it would have

20  been -- yeah, so I can't answer that.

21     Q.    Okay.  When you say you assume they'd be on

22  the documents, what documents are you referring to

23  specifically?

24     A.    The leave return request that April submitted.

25     Q.    For the July 2018 request to return, who were

David Wallace Pansing 4/11/2025

Page 182

1   you don't remember the exact date, when would that have

2   come in?

3        A.   Came in in November.  She was made provisional

4   at the time.  And then in December she was denied

5   because she didn't get documentation or the hold off.

6        Q.   And then was there a summer or spring of 2017

7   request?

8        A.   The summer 2017 request was the fall 2017

9   request.  Is that what you mean?

10       Q.   So you said that the spring 2018 request was

11  the third time she had submitted the same form, so I was

12  trying to figure out when the first time was that was

13  submitted.

14       A.   August '17.

15       Q.   You said August of 2017?

16       A.   Correct.

17       Q.   Okay.  And so that form was submitted twice,

18  then.  Or three times?

19       A.   Submitted in August of 2017 and then in

20  November of 2017 and then again in July of 2018, and CLR

21  wanted to see a return request that had been written

22  more recently.

23       Q.   Is there a policy or procedure or any other

24  kind of written guidance that deals with a student not

25  being permitted to submit the same return from leave

David Wallace Pansing 4/11/2025

Page 183

1    form?

2         A.    No, there's not -- wait, let me think, how you

3    phrased it.

4              So a student may only submit a form when they

5    have -- when they're past the date that the committee

6    has allowed them to submit, which is fine.  I mean, in

7    this case, in July of 2018 there was a denial based on

8    that.  So it wasn't that we didn't let her submit the

9    form, it was that we denied the request.

10        Q.    And so is there a policy, procedure or any

11   kind of written guidance that says if the request is the

12   same request X number of times, then the student will

13   not be admitted?

14        A.    No, but the purpose of the return request is

15   to meet the student where they are, hear what they're

16   doing at the time, work with them on what's going on at

17   the time.  So a three-year-old request or two-year-old

18   request is not -- not really relevant and wasn't

19   considered participating fully in the process.

20        Q.    Would you agree that the -- because earlier we

21   talked about individualized assessments.  Would you

22   agree that circumstances could exist where the same

23   request form could be used?

24        A.    So what I would say is that we would -- that

25   all that had to be done at that point was that if

**David Wallace Pansing 4/11/2025**

Page 206

1      A.     I interpret that as potentially hyperbole, but

2    something I cannot confirm.

3      Q.     "From Ms. Delaney, no reply," how do you

4    interpret that sentence?

5      A.     I interpret that as potentially hyperbole and

6    something I can't confirm.

7      Q.     Can't or won't confirm?

8      A.     Couldn't at the time and I don't know who that

9    person is, so I don't even know if I could confirm it at

10   this point.

11     Q.     Were you physically incapable of confirming or

12   -- with Ms. Brown-Nevers?

13     A.     No, I was not physically incapable of

14   confirming with Mr. Brown-Nevers.

15     Q.     Why didn't you?

16     A.     Because I was in my role, which was to define

17   what the student needed to do to return from leave and

18   to give her the guidance for that, which I did in the

19   email that I followed up with.

20     Q.     The email that you followed up with which you

21   call guidance is to try calling them on the phone, but

22   otherwise she needs to work with SFS, correct?

23     A.     That's correct.  SFS is the only office that

24   can take the financial hold off.

25     Q.     And earlier in the deposition where you

**David Wallace Pansing 4/11/2025**

Page 207

1    testified that you could take some action to help

2    facilitate communications between the student and other

3    departments, why didn't you do that in this situation?

4       A.    So in this situation I could see that she was

5    meeting with a lot of different people already and that

6    I assumed that those people would be working with her.

7       Q.    Okay.  So you took from "I've received no

8    reply for weeks from anyone.  From Ms. Brown-Nevers, no

9    reply.  From Ms. Delaney, no reply," as they were having

10   meetings; is that correct?

11              ATTORNEY GREENSPAN:  Object to the form.

12              THE WITNESS:  I saw that she had

13    connections with people in that office, that she knew

14    their names and presumably had sent them emails, and I

15    trusted that my colleagues were either working with

16    her or had worked with her and I -- yeah, that's what

17    I did.

18   BY ATTORNEY HARRIS:

19       Q.    So you assumed April was lying?

20              ATTORNEY GREENSPAN:  Object to the form.

21              THE WITNESS:  I don't necessarily assume

22    she was lying, but I had been working with April, she

23    often sent a followup email that didn't accept what

24    the original email responded -- had responded, and I

25    wasn't sure if that was what had happened in this

David Wallace Pansing 4/11/2025

Page 208

1    situation, too.

2    BY ATTORNEY HARRIS:

3        Q.    In preparation for the deposition where you

4    saw -- you say you saw emails from SFS to April Ploeger,

5    were those documents that were given to you or were

6    those things that you sought out on your own?

7        A.    They were given to me.

8        Q.    Did you bring those documents to the

9    deposition with you?

10       A.    No, I did not.

11       Q.    Why not?

12       A.    Because I wasn't in a role of bringing

13   documents to the deposition with me.

14       Q.    Well, I understand that that's your

15   understanding, but I guess you weren't aware that you do

16   -- did have the role to bring documents to the

17   deposition with you?

18               ATTORNEY GREENSPAN:  Objection.

19    Objection.  We put forth our objections to your

20    notice, including referencing the documents that were

21    responsive, they had already been produced.  There was

22    nothing else to bring here.

23               ATTORNEY HARRIS:  Maybe you should read

24    Rule 30(b)(2), but that's not how that works.

25   BY ATTORNEY HARRIS:

David Wallace Pansing 4/11/2025

Page 227

1    couldn't -- wasn't receiving messages in the hub

2    anymore.

3        Q.    Okay.

4        A.    So we started sending them to her by email.

5        Q.    And you looked in the hub and saw that April

6    had, in fact, not been able to access those messages,

7    correct?

8        A.    I believe that the -- yes.  Noticing that she

9    wasn't receiving messages, we figured it out and so

10   tried to meet her by sending the emails instead.

11       Q.    Got you.

12             But April here is saying that she was emailing

13   Penn.  Do you know why she wasn't getting any responses

14   to her emails, as opposed to hub messages?

15             ATTORNEY GREENSPAN:  Object to the form.

16             THE WITNESS:  So I don't know what

17    "emailing Penn" means, so I wouldn't have known then

18    and I don't know now.  I also think if there's a

19    hyperbole example, that might be one of them, all caps

20    "Any of my emails from Penn for months."

21   BY ATTORNEY HARRIS:

22       Q.    Did the University do anything to investigate

23   if April had, in fact, been sending emails to Penn for

24   months with no reply?

25       A.    I had replied to her and -- her email in less

David Wallace Pansing 4/11/2025

Page 228

1    than a month at this point.

2        Q.    Well, in the context of the sentence she's

3    saying she wasn't notified about the decision in terms

4    of fall leave until she called because nobody would

5    reply to her emails.  So in that context, what did Penn

6    do to investigate whether or not there were responses to

7    or even emails in that time frame?

8        A.    So in my office we did not have a set of

9    emails that suggested that she had been emailing and not

10   receiving a reply for months.  So we just didn't see

11   that.  That wasn't something we saw.

12       Q.    To get ready for your deposition did you

13   investigate what Penn did in response to this email from

14   her?

15       A.    No, that was not -- I didn't consider it -- I

16   didn't consider it a way or a claim that had merit, I

17   did not investigate it.

18       Q.    So you decided it didn't have merit before you

19   knew whether it had merit or not?

20       A.    I knew it to be false because I had e-mailed

21   her in the month before it.  So for the -- it wasn't

22   months.  So, you know.

23       Q.    The emails that you're referring to, are those

24   the August 1st, 2018 emails that we looked at in the

25   previous exhibit?

David Wallace Pansing 4/11/2025

Page 249

1    Mart.  He's still talking.

2                    THE WITNESS:  Ms. Ploeger had submitted

3    the same form multiple times and the committee did not

4    feel that that was sufficient engagement with the

5    process.

6    BY ATTORNEY HARRIS:

7        Q.    And what is the measurement of sufficient

8    engagement?

9        A.    Well, in this case it would have been writing

10   a new form, writing new responses to the form.

11       Q.    But if the form was written in full and as

12   truthfully as April could write the form, what does the

13   committee want, her to stop saying the word

14   "litigation"?

15                   ATTORNEY GREENSPAN:  Objection.

16                   THE WITNESS:  It has nothing to do with

17   that.  Litigation is handled by the office of general

18   counsel and not something that our committee takes

19   into account ever.

20   BY ATTORNEY HARRIS:

21       Q.    Well, the information about April's litigation

22   is specifically in the committee's mind and in the

23   committee's eyeballs, correct?

24       A.    That is not something we ever consider and we

25   have, in fact, advanced her requests after this request.

KAPLAN LEAMAN & WOLFE